## UNITED STATES v. CERTAIN SUBFREIGHTS DUE STEAMSHIP NEPONSET.

(District Court, D. Massachusetts. May 1, 1924. On Reargument, July 18, 1924.)

### Nos. 2228, 2277, 2314, 2407.

**1. Maritime liens ⊕30—Inquiry required of furnisher of repairs or supplies.**

A furnisher of repairs or supplies is required always to make inquiry as to the ownership of the vessel, but, if he finds that the person ordering the repairs or supplies is the owner or his agent, he need go no further, unless he has reasonable ground to suppose that the owner is without power to impose liens under the terms of his purchase, in which case he must use reasonable diligence to ascertain such terms, but is not required to extend his investigation into complicated facts.

**2. Maritime liens ⊕28—Provisions of sale contract held not to prohibit liens.**

Provisions of a contract for sale of a vessel that the buyer shall "not suffer to be continued" any lien on the vessel, but shall discharge the same within 15 days after it becomes due and payable, and that failure to perform any of its covenants shall entitle the seller to terminate the contract and retake the vessel, *held* not to prohibit the buyer from allowing a lien to be imposed, but to make its neglect to discharge the same within 15 days a breach of the contract.

**3. Maritime liens ⊕25—Statute gives lien to stevedore.**

Under Ship Mortgage Act 1920, § 30 (P), being Comp. St. Ann. Supp. 1923, § 8146¼ooo, a stevedore is entitled to a lien for services in discharging a ship.

**4. Maritime liens ⊕31—General agent for steamship company not entitled to lien for general disbursements.**

A general agent for a steamship company is not entitled to a lien for advancements and disbursements made generally for the company's vessels.

**5. Maritime liens ⊕24—Furnisher of supplies not entitled to lien, where credit was not given to vessel.**

Under Ship Mortgage Act 1920, § 30 (P), being Comp. St. Ann. Supp. 1923, § 8146¼ooo, a furnisher of supplies is not entitled to a lien, where the evidence shows affirmatively that credit was not given to the ship.

**6. Maritime liens ⊕3—Furnishers of supplies entitled to lien on freight money.**

Furnishers of supplies for a vessel are entitled to a lien on the freight money earned.

**7. Admiralty ⊕101—Court has power to distribute fund in its registry to all parties entitled to share therein.**

A court of admiralty has power to distribute a fund rightfully in its registry to the parties entitled thereto, even though some of them had no separate right to proceed in admiralty.

**8. Shipping ⊕149—Seller, retaking possession of vessel from purchaser, entitled to pending freight.**

The United States, on retaking vessel from purchaser for breach of contract, before delivery of her cargo, *held* entitled to the pending freight money, subject to claims having priority.

### On Reargument.

**9. Maritime liens ⊕1—Basis of liens is personification of ship.**

The true basis of admiralty liens is that the ship is personified, and is regarded as herself the offender in cases of tort, and is herself liable for supplies or repairs furnished for her benefit.

⊕For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**10. Maritime liens ⬤⇒3—Lien for supplies or repairs attaches to freight earned.**

Freight earned is regarded as belonging to the vessel, and under admiralty rule 13 (268 Fed. xii) a lien for supplies or repairs attaches to it as if it were a part of the ship.

**11. Maritime liens ⬤⇒3—That supplies not furnished for particular voyage does not defeat lien.**

A furnisher of supplies for a vessel is not deprived of a lien on freight moneys because the supplies were not furnished for particular voyage on which freight was earned.

In Admiralty. Suit by the United States against certain subfreights due the steamship Neponset with Wambersie & Son and others as intervening petitioners. Independent suits by the McCormack Stevedoring Company, the Robbins Dry Dock & Repair Company, and the Standard Oil Company against the United States, as owner of the Neponset. Claims to liens on vessel and freight money determined.

In No. 2228:

The United States Attorney.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for petitioner Willett.

G. Philip Wardner, of Boston, Mass., for interveners Wambersie & Son.

Charles R. Hickox and Kirlin, Woolsey, Campbell, Hickox & Keating, all of New York City, and Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for intervening petitioners Standard Oil Co., McCormack, Stevedoring Co., and Traeger.

Fitz-Henry Smith, Jr., of Boston, Mass., and Bigham, Englar & Jones, of New York City, for intervening petitioner Buck.

Charles F. Dutch, of Boston, Mass., for intervening petitioner Robbins Dry Dock & Repair Co.

In No. 2277:

Charles R. Hickox and Kirlin, Woolsey, Campbell, Hickox & Keating, all of New York City, and Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for libelant Standard Oil Co.

G. Philip Wardner, of Boston, Mass., for interveners Wambersie & Son.

The United States Attorney.

In No. 2314:

Charles R. Hickox and Kirlin, Woolsey, Campbell, Hickox & Keating, all of New York City, and Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for libelant McCormack Stevedoring Co.

The United States Attorney.

In No. 2407:

Chas. F. Dutch and Putnam, Bell, Dutch & Santry, all of Boston, Mass., for libelant Robbins Dry Dock & Repair Co.

The United States Attorney.

LOWELL, District Judge. These legal proceedings arose out of the last voyage of the steamer Neponset while under the control of

the Elder Steel Steamship Company. The Neponset was registered in Philadelphia. The United States took possession of the Neponset by means of a libel brought to get possession of the vessel, which had been operated by the steamship company under an agreement with the United States Shipping Board. After taking possession the United States expended $12,947.63 in discharging the cargo; the freight money which is the subject of this case was thereby earned, and has been deposited in this court. By agreement of parties a claim of the master was allowed and there remains in the registry the sum of $23,-077.03. The claim of Leonard Buck, hereinafter referred to, is in excess of this amount. The total sum of the demands of the other claimants may be met without exhausting the fund.

The facts can more conveniently be stated in chronological order, with the exception of those relating to Wambersie & Son and Buck, which will be mentioned later. The Neponset was about to start on a voyage to the Pacific Coast. She needed some repairs, which were furnished by the Robbins Dry Dock Company, and she then proceeded on her voyage. On the return trip she was furnished with oil by the Standard Oil Company at San Pedro, Cal., and Cristobal, Canal Zone. When she arrived in New York, part of her cargo was unloaded by the McCormack Stevedoring Company, and services in relation thereto were furnished by Traeger. She then went to Boston, where she was libeled by the United States government. In unloading at Boston, an expense of $12,947.63 was incurred, which was paid by the United States.

The United States, after taking possession of the Neponset, filed a libel against the freight moneys, and the Robbins Company, Standard Oil Company, McCormack Company, and Traeger filed intervening petitions. Wambersie & Son and Buck also filed intervening petitions. The former, acting as general agent of the steamship company on the continent of Europe, had made advances to the Neponset on a former voyage. Buck claimed as the holder of an assignment of the freights of certain steamers, which he alleged covered freights of the Neponset. The original assignment was given by the steamship company to secure advances made to it to discharge liens on steamers other than the Neponset before she started on her last voyage. The Robbins Company, Standard Oil Company, and McCormack Company also filed independent libels, claiming liens on the vessel for the repairs, supplies, or services furnished her under the circumstances above set forth. In the case of the Standard Oil Company, Wambersie & Son filed an intervening petition.

In the libel against the freight, the United States based its right to recover on a clause in the charter party under which the Neponset was first operated. At the first hearing of this case the intervening petitioners contended that the charter party had been superseded by a sales agreement which contained no clause giving a lien on freights. The United States then asked leave of court to amend its libel, so as to claim $12,947.63 for the expense of unloading the cargo after it took possession, and in the alternative the freight money earned, on the ground that the United States was entitled thereto as the owner

of the vessel. The allowance of this amendment was strongly opposed, and the court took it under advisement. I now allow the latter part of it, as the facts upon which it was predicated were fully developed at the hearing. I disallow the first part, because it is inconsistent with the part allowed. If the United States is entitled to claim the freight as owner, it cannot be reimbursed for the expenses made necessary in earning the freight. A further pleading was filed by the United States on January 19, 1924, after the hearing, argument, and reargument. This pleading is entitled a "Claim and Petition." It sets up in a different form the same matter contained in the amendment, and is disallowed, as it adds nothing further to the claim of the United States.

A petition by the receivers of the Elder Steel Steamship Company for leave to intervene was filed after the hearing and arguments. As will appear hereafter, no part of the freight money belongs to the company, and its receivers are not, therefore, entitled to it. The petition is denied.

It will conduce to clearness if we first consider the independent libels of the Robbins Dry Dock Company, Standard Oil Company, and McCormack Company. The questions involved in all three are similar, and will be considered together. The libelants contend that the steamship company was operating the Neponset as owner, and that they furnished the repairs, supplies, and services on the order of the owner, and are entitled to liens. The United States says that the Neponset was being operated under a charter party, which gave the charterer no right to allow liens to be imposed on the vessel. The libelants meet this contention by insisting that the charter party which was in force at first had been superseded by another agreement. The facts are as follows:

The Neponset was delivered to the Elder Steel Steamship Company on May 13, 1920, under a charter party to last for 18 months, which contained a clause forbidding liens. Afterwards negotiations took place, in the course of which the Shipping Board on October 20, 1920, wrote to the company, saying that they had changed from the charter purchase plan of April 8, 1920, to the new sale policy of August 16, 1920, one of the terms of which was that 10 per cent. of the purchase price of the vessel was to be paid before its delivery. On November 24, 1920, the attorney of the Shipping Board sent to the company an agreement for sale, with an accompanying letter which reads in part as follows:

"I transmit herewith original and duplicate of agreement of sale on the steamship Neponset, with the request that you kindly execute the original thereof on page 12 and the acknowledgment on page 14 and return same to this office at the earliest possible date. You will note that it is provided in this agreement that you are to pay, upon execution, the sum of $45,902.31, which, together with the sum of $144,934.11 previously paid by you, totals $190,736.-42, which is the ten (10) per cent. initial payment on the vessel."

The new agreement was in part as follows:

"Whereas, the seller has sold to the buyer and the buyer has purchased from the seller that certain steel vessel named the Neponset, official number 217019, registered at the port of New York, of about 7,435 tons gross and 4,565

tons net register, now being operated by the buyer under the terms of a charter sales agreement between the parties hereto, dated April 10, 1920; and

"Whereas, the said vessel was delivered to the buyer on May 13, 1920; and

"Whereas, the purchase price of said vessel is the sum of $1,907,364.25; and

"Whereas, the buyer has paid to the seller under the terms of said charter sales agreement the sum of $144,934.11, and agrees to pay in addition thereto, upon execution of this agreement, the sum of $45.802.31, which sums total $190,736.42, which is ten (10) per centum of the said purchase price; and

"Whereas, the buyer has requested that the seller modify the said charter sales agreement to conform to the terms of the purchase plan now in use by the seller; and

"Whereas, the seller is willing to modify the said charter sales agreement;

"Now, therefore, for and in consideration of the premises and the mutual covenants hereinafter contained, it is agreed by the seller and the buyer as follows:

"(1) The buyer may retain said vessel for operation hereunder. ⁂ ⁂ ⁂

"(5) (d) The buyer shall not suffer to be continued any lien or charge having priority to or preference over the title of the seller in the vessel, or any part thereof, but will in due course and in any event, within fifteen (15) days after the same becomes due and payable, pay or cause to be discharged or make adequate provision for the satisfaction or discharge of all lawful claims or demands which might in equity, in admiralty, or at law, or pursuant to any statute have precedence over the title of the seller as a lien or charge upon the vessel or any part thereof, or cause the vessel to be released or discharged from any lien therefor, provided this covenant shall not be deemed to be broken to the extent that there may be outstanding on behalf of the buyer or seller with solvent underwriters not yet having been paid nor formally rejected, a claim for reimbursement upon account of the matter upon which any such lien is alleged to be founded, nor to the extent that the seller has received insurance, or other funds, properly applicable hereunder as reimbursement on account of such matter or the payment or discharge thereof, always, however, subject to the condition that the vessel be discharged from any libel, attachment or other detention under process or color of legal authority within fifteen (15) days from the time when same attaches. ⁂ ⁂ ⁂

"(5) (g) To carry a properly certified copy of this agreement with the ship's papers, and to take such other appropriate steps designated to it by the seller from time to time as will give notice to the world that the buyer has no right, power, nor authority to suffer or permit to be imposed on or against the vessel any liens or claims which might be deemed superior to or a charge against the interest of the seller in the vessel. ⁂ ⁂ ⁂

"(6) If at any time after the delivery of the vessel, and prior to the transfer of title hereunder, the buyer shall fail to perform any of its covenants and agreements herein made, the seller shall have the right at any time after such default to withdraw the vessel from the buyer, whereupon all rights and claims against the seller arising in favor of the buyer hereunder shall cease and determine. ⁂ ⁂ ⁂"

The steamship company paid the sum of $45,802.31, making up the 10 per cent. initial payment. It objected, however, to a provision in the agreement that the freight earned by the Neponset should be set aside as a sinking fund, and, at its request, the requirement for the sinking fund was extended, at first until April 15, and afterwards for 30 days longer. The company never executed the agreement, but continued in possession of the vessel for more than 18 months after May 13, 1920. It never paid the second installment of the purchase price, and thereby committed a breach of the agreement.

I find on these facts that the charter party under which the Neponset was first operated had been abandoned, and, while the new sales agreement was never executed by the Elder Steel Steamship Company, the

Neponset was being operated under an arrangement in substantial accordance therewith; the only provision to which the company objected being the clause as to a sinking fund.

It was in evidence that the Standard Oil Company had been told by the Elder Steel Steamship Company that it owned the Neponset, and that the Robbins Company furnished repairs on the order of Sterling, the port captain of the company; also that the McCormack Company and Traeger furnished their services on the order of some officer of the company.

On this state of facts the three libelants contend that they are entitled to liens on the Neponset. The United States insists, however, that under the decision in U. S. v. Carver, 260 U. S. 482, 43 Sup. Ct. 181, 67 L. Ed. 361, they are not entitled to a lien; that they were put upon their inquiry as to the power of the company to give a lien, and that, if they had inquired, they would have found that the Neponset belonged to the United States and that the company could not give a lien. To this contention the three libelants reply that U. S. v. Carver is not applicable, but that, even if it is, and if they were required to go further and make a thorough investigation of the facts, they would have found that the vessel was being operated under an unexecuted agreement, by the terms of which it was evidently contemplated that liens might be filed against the vessel.

[1] On this branch of the case I rule that U. S. v. Carver requires all furnishers of repairs or supplies always to make inquiry, whether or not they know facts which would lead them to think that the vessel was not owned by the company operating it. I further rule that under that decision the furnisher need go no further in his investigation if he finds out that the person ordering the repairs or supplies is the owner or his agent, unless he has reasonable grounds to suppose that the owner was in possession under an agreement for purchase which forbade the imposition of liens. In the latter case he must use reasonable diligence to discover the terms of the agreement for purchase. The West Haven (C. C. A.) 1924 A. M. C. 681, 294 Fed. 534. The doctrine of the Carver Case should not be extended. Even if there are circumstances which put the furnisher on inquiry, he should not be obliged to conduct an investigation into facts often complicated, sometimes requiring judicial determination for their final interpretation, and to decide at his peril whether a lien was possible or not.

[2] Upon the facts in this case I find that the Standard Oil Company, the Robbins Dry Dock Company, and the McCormack Stevedoring Company are entitled to liens. Wambersie & Son, who were intervening petitioners in the Standard Oil Company Case, being general agents of the owners, are apparently not entitled to a lien; but, as their claim may depend on the Dutch or German law, they may have leave to offer proof concerning the matter. If I am in error as to the scope of the decision in U. S. v. Carver, and there was a duty imposed on the libelants to find out the terms of the agreement for purchase, I rule that the agreement for purchase in this case gave the vendee in possession a right to impose a lien for repairs or supplies. I am aware of the decision of Judge Cushman in The Henry S. Grove (D. C.) 287 Fed.

247; but if the agreement considered in that case be the same as the one in the case at bar, as to which I am in doubt, I respectfully disagree with that decision. The provisions of paragraph 5 (d) show that liens were within the contemplation of the parties, and clause (g) does not add any further restriction, but merely provides for notice. The proper construction of clause 5 (d) and clause 5 (g) is, in my opinion, not that the Elder Company had no power to allow a lien to be imposed, but that its neglect to pay it within 15 days after it became due would be a breach of the agreement.

The Buckhannon, 1923 A. M. C. 645 [reversed (C. C. A.) 299 Fed. 519], is distinguishable from the case at bar. The terms of the agreement in that case were identical with those in U. S. v. Carver. The phrase "not suffer nor permit to be continued," used in the Carver Case, is construed by Mr. Justice Holmes to mean "not suffer any lien nor permit the same to be continued." 260 U. S. at page 489, 43 Sup. Ct. 182, 67 L. Ed. 361. The words in the present case, "not suffer to be continued," are vitally different. The South Coast, 251 U. S. 519, 40 Sup. Ct. 233, 64 L. Ed. 386; U. S. v. Carver, 260 U. S. at page 489, 43 Sup. Ct. 181, 67 L. Ed. 361.

[3] It was held by the Circuit Court of Appeals for the Second Circuit in The Muskegon, 275 Fed. 348, that stevedores would not have a lien under the Lien Act of 1910. That act read in part as follows:

"Any person furnishing repairs, supplies, or other necessaries, including the use of dry dock or marine railway, to a vessel, whether foreign or domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel which may be enforced by a proceeding in rem, and it shall not be necessary to allege or prove that credit was given to the vessel." 36 Stat. 604, Comp. St. § 7783.

In 1920 the act was amended to read as follows:

"Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel." Subsection P of section 30, Act of June 5, 1920, 41 Stat. 1005, U. S. Comp. St. Ann. Supp. 1923, § 8146¼ooo.

It will be noticed that "towage" is added to the former act, and that the words "use of dry dock or marine railway" are changed in position, so as to come before the words "or other necessaries." Judge Cushman has held in The Henry S. Grove (D. C.) 285 Fed. 60, that this indicated the intention of the Congress to include claims like those of stevedores. See, also, The Liberator (D. C.) 1924 A. M. C. p. 684, 298 Fed. 159. With this I agree. In my opinion a stevedore is now entitled to a lien under the act of 1920. The McCormack Stevedoring Company, therefore, as well as the Robbins Company and the Standard Oil Company, is entitled to a lien.

The rights of the libelants were not waived by proof in the receivership proceedings. The William B. Murray (D. C.) 240 Fed. 147; The Hattie Thomas (C. C. A.) 262 Fed. 943.

The next step is to consider the proceedings relating to the freight

moneys. At this stage it will be convenient to dispose of the intervening petition of Leonard Buck. His rights depend on a reassignment of an assignment of freights to be earned on certain vessels, alleged to include the Neponset, originally assigned to M. G. Chase & Co. by the Elder Company. A short answer to Buck's claim is that, as will appear later, the Elder Company has no rights to the freights of the Neponset, and therefore Buck, the present holder of the assignment, takes nothing by it.

[4] Wambersie & Son are apparently not entitled to share in the freight money, as a general agent of the owners has no right to a lien. The Centaurus (C. C. A.) 291 Fed. 751, and cases cited; The Hoxie (C. C. A.) 1924 A. M. C. 630, 297 Fed. 189. But, as their claim may depend on the Dutch law, a sufficient sum should be retained in the registry to satisfy it, and they may have leave to offer proof concerning the matter.

[5] Traeger, unfortunately for him, was too truthful. He testified ingenuously, when his deposition was taken, that he did not give credit to the vessel. Although it is not necessary, under the terms of the Lien Act, to allege or prove that credit was given to the vessel (U. S. Comp. St. Ann. Supp. 1923, § 8146¼ooo), yet when the evidence shows that credit was not given to the vessel the lien must fail.

[6] The rights of stevedores or materialmen to share in the freight money has not been much discussed in the adjudicated cases, but there is ample authority for allowing it. The J. F. Spencer, Fed. Cas. No. 7316; The Caroline, 1 Lowell, 173, Fed. Cas. No. 2419; The Velox (D. C.) 21 Fed. 479; Freights of The Kate (D. C.) 63 Fed. 707; The Chas. H. Cramp (D. C.) 1924 A. M. C. 131, 289 Fed. 145. The Robbins Company, however, are not entitled to a lien on the freight money, as the repairs which they furnished did not assist in the earning of it; it having been earned on a later voyage than that for which the repairs were made. The Standard Oil Company and McCormack Company are entitled to share in the freight money.

The result is as follows:

The Robbins Company may have a lien on the vessel for $1,892.50.

Wambersie & Son may or may not be entitled to a lien on the vessel, depending on proof to be hereafter offered.

The Standard Oil Company may receive out of the freight money the sum of $7,646.92.

The McCormack Company may similarly receive the sum of $1,929.28.

Traeger and Buck are not entitled to share in the freight money.

An amount sufficient to satisfy the claim of Wambersie & Son should be reserved, to await the result of the proof requested by them.

[7] There will be a balance remaining in the registry after the two last-mentioned sums are paid. It was contended by the proctor for the Standard Oil Company that the court could not award any part of the freight to the United States because its rights depended on a contract for sale, over which the admiralty court had no jurisdiction. He cited for this contention the case of The Ada, 250 Fed. 194, 162 C. C. A. 330. In the present case, however, a fund is rightfully in the registry of this court, and it has the power to distribute it to the parties

entitled thereto, even though some of them had no separate right to proceed in admiralty. The Advance (D. C.) 63 Fed. 704; The Island City, 1 Lowell, 375, Fed. Cas. No. 7109; The Caroline, 1 Lowell, 173, Fed. Cas. No. 2419; The St. Johns (D. C.) 101 Fed. 469.

[8] The United States took advantage of clause 6 of the agreement and withdrew the vessel from the Elder Company for its failure to pay the second installment of the purchase price. Under the terms of the agreement, the rights of the company ceased as soon as the libel for possession was filed. The freight was not earned till after this; the United States is therefore entitled to the surplus remaining in the registry after the successful claimants to freight have been paid and there has been set aside a sum sufficient to meet Wambersie & Sons' possibly successful claim. Merchants' Banking Co. v. Cargo of the Afton, 134 Fed. 727, 67 C. C. A. 618; The Chas. H. Cramp (D. C.) 1924 A. M. C. 131, 289 Fed. 145; Pelayo v. Fox, 9 Pa. 489; Carver, Carriage of Goods by Sea (6th Ed.) § 592; Scrutton, Charter Parties (8th Ed.) p. 350. See Brown v. Tenner, L. R. 3 Ch. App. 597.

## On Reargument.

The question for decision on this reargument is whether the court was in error in refusing a lien on the freight moneys to the Robbins Company on the ground that the repairs furnished by that company were not made for the voyage on which the freight was earned. It is contended, first, that, this being a round-trip voyage to the Pacific Coast and back, the repairs furnished by the Robbins Company just prior to the departure of the Neponset for the Pacific, were made for that voyage; and, second, that there is a lien on the freight moneys, even if they were not earned on the voyage for which the repairs were made.

[9] In the view which I take of the question it will be unnecessary to consider the first alternative. I think that the opinion was wrong in not allowing the Robbins Company to share in the freight moneys. It has often been said that maritime liens are granted because they assist the vessel to complete her voyage. The somewhat infelicitous expression used in The St. Jago de Cuba is as follows:

"The whole object of giving admiralty process and priority of payment to privileged creditors is to furnish wings and legs to the forfeited hull, to get back for the benefit of all concerned; that is, to complete her voyage." 9 Wheat. 409, 416 (6 L. Ed. 122). (We are not informed by the learned judge in what way legs would assist the vessel.)

Similar remarks are common in the reports. However, as is pointed out in the able brief for the Robbins Company, this cannot be the true reason. If the reason for allowing liens were that the vessel is thereby enabled to complete her voyage, there would be no lien for a tort committed by a ship in colliding with another ship. But not only is there such a lien (Marsden, Collisions at Sea [8th Ed.] p. 86), but it takes precedence over prior liens for supplies (The John G. Stevens, 170 U. S. 113, 122, 18 Sup. Ct. 544, 548 [42 L. Ed. 969]). In that case Mr. Justice Gray says:

"The offending ship is considered as herself the wrongdoer, and as herself bound to make compensation for the wrong done."

This doctrine is carried to such an extent that "if a ship, in command of a pilot whom it was compelled to take, injures another ship through fault of the pilot, the ship is liable, unless exonerated by statute. If charterers are owners for the voyage, and appoint the master and crew, the ship is still liable. If she were navigated by pirates, who had run away with her, she would, in my opinion, be responsible to the injured ship." The Arturo (D. C.) 6 Fed. 308, 313. The vessel is personified, and the true reason for the tort lien is, as pointed out by Mr. Justice Gray, that the ship is regarded as herself the offender. Similarly, the true reason for a lien given for supplies or repairs seems to be that they were furnished for the benefit of the vessel, and that she is bound to pay for them, as if she were a living person.

[10] Freight is regarded as belonging to the vessel, and the lien attaches to it as if it were a part of the ship, like the tackle. See the thirteenth admiralty rule, 254 U. S. Appendix, 268 Fed. xii.

[11] There is surprisingly little authority on the question, but I have found none forbidding the lien. In The Freights of the Kate (D. C.) 63 Fed. 707, Judge Brown, in deciding the priorities of the various liens on the freights of a vessel, says, in speaking of a lien which comes fourth in rank, but prior to other liens:

"Next come the shipowners' claims for indemnity against liability for the supplies to the steamers in New York previous to the last voyages from Brazil. * * *" 63 Fed. at page 726.

This is a direct authority for allowing the Robbins Company to share in the freight; I shall follow it.

The opinion may be modified, by striking out the following words in the first paragraph on page 9:

"The Robbins Company, however, are not entitled to a lien on the freight money, as the repairs which they furnished did not assist in the earning of it; it having been earned on a later voyage than that for which the repairs were made."

In place of this paragraph the following may be inserted:

"The Robbins Company are entitled to a lien on the freight money, and may share in it."

The opinion should also be changed by striking out on the ninth page the words, "The Robbins Company may have a lien on the vessel for $1,892.50," and substituting, "The Robbins Company may receive out of the freight money the sum of $1,892.50."