In the Matter of **ADMIRALTY LINES, LTD.**

No. 66-692.

United States District Court
E. D. Louisiana,
New Orleans Division.

March 5, 1968.

Edward M. Heller, New Orleans, La., for Admiralty Lines, Ltd.

Charles Kohlmeyer, Charles E. Lugenbuhl, New Orleans, La., for Cooper Stevedoring of La., Inc. and Walsh Stevedoring Co., Inc.

RUBIN, District Judge:

On November 24, 1965, Cooper Stevedoring of Louisiana, Inc. ("Cooper"), a Louisiana corporation, filed a libel in this Court against Admiralty Lines, Ltd. ("Admiralty"). Cooper sought to recover $56,069.48 due it from Admiralty for stevedoring services performed by Cooper at Admiralty's request. The amount included a balance due of $11,815.84 resulting from services rendered in the Port of New Orleans to the M/V ARISTODIMOS. Pursuant to the libel, writs of foreign attachment were issued against subfreights due Admiralty by consignees of cargo discharged from various vessels.

On November 24, 1965, Walsh Stevedoring Company, Inc. ("Walsh"), an Alabama corporation engaged in the general stevedoring business in the Ports of Mobile, Alabama, and Pascagoula, Mississippi, also filed a libel in this Court against Admiralty. Walsh sought to recover $2,309.75 due it from Admiralty for stevedoring services performed by Walsh at Admiralty's request. Pursuant to the libel, writs of foreign attachment were issued against subfreights due Admiralty by consignees of cargo discharged from various vessels. This libel, along with Cooper's and claims by A/S D/S DANNEBROG (C. K. HANSEN), and other parties, was consolidated in number 7749 on the admiralty docket of this Court.

An involuntary bankruptcy petition was filed against Admiralty on February 4, 1966, in the United States District Court for the Southern District of New York, and Admiralty was adjudicated a bankrupt on March 15, 1966. On July 8, 1966, Admiralty's trustee was authorized by the referee in New York to institute ancillary proceedings in this court in order to determine the validity of liens asserted by the various libelants against funds totaling $99,487.07 on deposit in the registry of this court in consolidated action number 7749.

The trustee petitioned this court for the exercise of ancillary relief. Judge Heebe granted the petition and referred the matter to the Honorable E. E. Talbot, referee in bankruptcy. Cooper and Walsh objected to the jurisdiction of the court and moved that the order of reference be rescinded. Briefs were filed on both sides. Judge Heebe denied both the objection to the jurisdiction and the motion.

The referee then proceeded to determine the issues. Counsel for the trustee and A/S D/S DANNEBROG (C. K. HANSEN) stipulated that $20,000.00 was to be retained in the registry of the court to secure any judgment the owners of the vessel might obtain for charter hire that might constitute a maritime lien on these funds. Of the remaining claimants, only Cooper and Walsh appeared. The referee held that attachment liens claimed by Cooper, Walsh, and other libelants were null and void under Section 67a(1) of the Bankruptcy Act. The referee also held that maritime liens asserted by Cooper and Amerind Shipping Corporation were null and void against the trustee as a result of 46 U.S.C.A. § 973. On May 26, 1967, Cooper and Walsh petitioned for a review of the referee's decision. Because the original libels were reallotted to this section, the

petition for review has been transferred to this section also.

### A. *Reference to The Referee*

■ Cooper and Walsh contend that Judge Heebe erred in denying their motion for the rescission of his order referring the petition of Admiralty's trustee to the referee. They urge that the proper procedure for the trustee to have followed was to intervene in the pending consolidated admiralty action brought by them and other claimants against Admiralty and to have the proper judge of this court determine in that proceeding the validity of the liens asserted by them. They contend that what the court did was, in effect, to allow a referee to enter an order terminating litigation in a district court by concluding that funds held in the registry of the court should be paid to the trustee in another district and thus to transfer the res to another court. Moreover, they contend that the reference to the trustee allowed an inferior officer of the court to direct an agent of the court itself to turn over funds. Judge Heebe considered these arguments when they were initially made and concluded that the reference should not be rescinded. On oral argument of the case, I informed counsel that I would not review his ruling. However, in any event, I reach the same conclusion on the merits as did the referee, and it would be pointless to belabor the issue further.

### B. *Jurisdiction*

■ Walsh has also urged that the court lacks jurisdiction over Walsh Stevedoring, apparently on the theory that Walsh is not subject to process within the jurisdiction. However, Section 67a (4) of the Bankruptcy Act, 11 U.S.C.A. § 107(a) (4), provides, "The Court shall have summary jurisdiction of any proceeding by the trustee or debtor, as the case may be, to hear and determine the rights of any parties" in an action to determine the validity of a lien obtained within four months before the filing of a petition in bankruptcy. The trustee is entitled to the same summary remedies in an ancillary proceeding as in the court in which the original bankruptcy action is brought.[1] While "due notice" to all parties in interest is required, Walsh had actual notice through service of the trustee's petition on its attorney in the related admiralty proceeding, and it appeared through its counsel in the bankruptcy proceedings. Under the circumstances of this case, the Court finds that service on Walsh's attorneys in the related proceeding constituted "due notice" within the meaning of Section 67a(4).

■ Walsh is certainly put to greater inconvenience in asserting its claims here than it would be if the action were at its corporate domicile. However, the funds in dispute are in the registry of this Court, and Walsh has asserted a claim to those funds in an admiralty action pending before this Court. The forum for decision is the same in each case, and it is no more inconvenient for Walsh to assert its claims in this matter than in the other actions pending in this same jurisdiction. I therefore conclude that Walsh's jurisdictional claim is without merit.

### C. *The Attachment Liens*

■ It is clear from the record that Admiralty was insolvent when the United States Marshals attached the subfreights. The balance sheets prepared by the trustee's expert witness, a steamship accountant and C.P.A., showed gross insolvency of Admiralty on October 31, 1965 and November 30, 1965. This was true whether the assets and liabilities of Admiralty were considered alone or as consolidated with those of Interseas Shipping Corporation, a corporation that had the same shareholders as Admiralty and acted solely as the exclusive general agent for Admiralty. It is therefore clear that Admiralty was insolvent when

1. Lazarus, Michel & Lazarus v. Prentice, 1914, 234 U.S. 263, 34 S.Ct. 851, 58 L.Ed. 1305; Babbitt v. Dutcher, 1910, 216 U.S. 102, 30 S.Ct. 372, 54 L.Ed. 402; 1 Collier on Bankruptcy ¶2.74, pp. 357–358 and n. 4. See also 4 Collier on Bankruptcy ¶67.18, p. 174.

the Marshal attached the subfreights. It is likewise clear that these attachments were made within four months of the filing of the bankruptcy petition against Admiralty. They are therefore null and void under Section 67a(1) of the Bankruptcy Act.[2]

### D. *Maritime Liens*

■ The referee correctly found that the vessel was operated under a time charter containing a standard prohibition of lien clause.[3] The referee also correctly found that Cooper "knew '* * * or by the exercise of reasonable diligence could have ascertained * *.' that M/V ARISTODIMOS was chartered under the Produce Exchange form containing the prohibition of lien clause." The referee's finding in regard to Cooper's knowledge of the prohibition of lien clause appears to be clearly correct, and Cooper does not challenge it. It is therefore clear that Cooper obtained no lien on the vessel itself.[4]

However, Cooper contends that it has a lien on the subfreights because it rendered the stevedoring services to the M/V ARISTODIMOS that resulted in earning these subfreights, and because the prohibition of lien clause merely prevents liens that injure the interest of the vessel owner and does not prevent the imposition of liens subordinate to his interests. The question raised, therefore, is whether a stevedore can have a valid maritime lien on subfreights earned by a vessel when the stevedore has no lien on the vessel itself.[5] Cooper says it does and that this result is reached as merely a matter of logic: The charter prohibits liens on the vessel. It does not prohibit liens on the subfreights. Cooper furnished stevedoring services that helped earn the subfreights. Therefore it has a lien. QED. And for good measure it cites a half dozen cases that it says reach this result: United States v. Freights, etc., of the Mount Shasta, 1927, 274 U.S. 466, 47 S.Ct. 666, 71 L.Ed. 1156; The Henry S. Grove, W.D.Wash., 1922, 285 F. 60; The Liberator, D.C.Md., 1924, 298 F. 159; United States v. Certain Subfreights Due S.S. Neponset, D.C. Mass., 1924, 300 F. 981, 987, rev'd on other grounds sub nom. United States v. Robins Dry Dock & Repair Co., 1 Cir., 1926, 13 F.2d 808; In Re North Atlantic & Gulf Steamship Co., S.D.N.Y., 1926, 204 F.Supp. 899, 907; Marine Chartering Co. v. Schirmer Stevedoring Co., N. D.Calif., 1961, 194 F.Supp. 488 (by implication).

■ The logic is based on faulty premises. It assumes that the only result of the "prohibition of lien" clause is to prevent a lien on the vessel to the owner's prejudice and that a stevedore obtains a lien against the subfreights as a result of performing services that helped earn the subfreights. But admiralty law has long ago ceased to create new liens. The only liens recognized today are those created by statute and those historically

---

**2.** Indeed, counsel for Cooper and Walsh has conceded in a memorandum submitted to the Court that the trustee "has merit in his position insofar as the *quasi in rem* portion of the claims are concerned * * *. [A]n intervening bankruptcy would serve to dispose of any possibility of there being procured a lien on the amount seized under the garnishments."

**3.** The charter provides, "Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel."

**4.** The effect of the standard prohibition of lien clause is discussed in Gilmore and Black, The Law of Admiralty, 558–568

(1957). See also Ocean Cargo Lines, Ltd. v. North Atlantic Marine Co., S.D.N.Y., 1964, 227 F.Supp. 872, 876.

**5.** There was no agreement between the parties to give Cooper a lien on the subfreights. It has been intimated that such an agreement might create a lien, but it appears to be well settled that the parties to a maritime transaction cannot by agreement confer lien status or a claim that is not by nature a lien claim or waive the conditions for its attachment. Gilmore & Black, The Law of Admiralty, 481–482 (1957). However, charter parties providing that the owner shall have a lien against cargo and freight have been held to create such a lien. Id., at pp. 517–518, n. 103 and cases there cited.

recognized in maritime law. There are no liens by analogy, and "[m]aritime liens * * * cannot be conferred on the theory of unjust enrichment or subrogation." [6] This principle is summed up in the dictum that the maritime lien is *"stricti juris* and will not be extended by construction, analogy or inference." [7] Neither the applicable statutes nor the traditional maritime law permits the subfreights earned by a vessel to be subject to a lien apart from a lien on the vessel itself. The subfreights the vessel earns are for lien purposes an integral part of the vessel.[8] They are no more subject to separate liens than the steel plates that are furnished to repair its hull or parts that are ordered to repair the winches to enable them to load the cargo.

The applicable principles were discussed and applied by the United States District Court for the Southern District of New York in Ocean Cargo Lines, Ltd. v. North Atlantic Marine Company [9] where a similar contention had been made. It would be supererogatory to quote at length the excellent analysis made of the controlling authorities in that case by Judge Feinberg. I agree with his conclusion that the inclusion of a "prohibition of lien" clause in the charter of a vessel precludes not only liens against the vessel itself but separate liens against the subfreights that it earns.

Moreover, none of the cited cases stands for the proposition that Cooper urges. On the contrary, several of them note in express terms that there can be

no maritime lien on freights or subfreights unless there is a lien on the vessel itself, e. g., In Re North Atlantic & Gulf Steamship Co., supra, 204 F.Supp. at 907; [10] Marine Chartering Co. v. Schirmer Stevedoring Co., supra, 194 F.Supp. at 491.[11] That is likewise the clear implication of the holding in United States v. Certain Subfreights Due SS Neponset, supra, that Traeger, a furnisher of services in the unloading of a vessel, was not entitled to a lien because his deposition revealed that he did not rely on the credit of the vessel in rendering his services. As the court noted in rejecting Traeger's claim for a lien on the subfreights, "[W]hen the evidence shows that credit was not given to the vessel the lien must fail." 300 F. at 988. United States v. Freights, etc., of the Mount Shasta, supra, does not require a contrary result; in that case the United States had contracted for a lien on subfreights for any amounts due it under the charter party. The Supreme Court there held that subfreights could constitute a res sufficient to give a court jurisdiction in rem; the Court did not deal with the question of whether a party can obtain a lien against subfreights in the absence of a lien on the vessel itself when there is no express agreement between the parties creating such a lien.

The historic rule is that "there could be no maritime lien on the freights if there was none on the ship," for "[the] freight is incident to the ship." United States v. Robins Dry Dock & Repair Co., supra, 13 F.2d page 813. That opinion contains an extensive review of the Eng-

6. The Eurana, 3 Cir., 1924, 1 F.2d 684, 686.

7. Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 1920, 254 U.S. 1, 12, 41 S.Ct. 1, 65 L.Ed. 97 (Brandeis, J.). See also, e. g., Osaka Shosen Kaisha v. Pacific Export Lumber Co., 1923, 260 U.S. 490, 499, 43 S.Ct. 172, 67 L.Ed. 364; United States v. S.S. Lucie Schulte, 2 Cir., 1965, 343 F.2d 897, 899.

8. See United States v. Certain Subfreights Due S.S. Neponset, D.C.Mass., 1924, 300 F. 981, 989.

9. 1964, 227 F.Supp. 872.

10. Aff'd on other grounds sub nom. Schilling v. A/S D/S Dannebrog, 2 Cir., 1963, 320 F.2d 628.

11. Aff'd in part on other grounds sub nom. Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp., 9 Cir., 1962, 306 F. 2d 188. The dicta in the Ninth Circuit opinion, at page 192, that "Maritime liens may be obtained against freights, independent of any lien against the vessel" appears to be merely a reference to the exception to the general rule that is sometimes said to exist in favor of liens granted by contract. See note 5 supra.

lish and early American authorities. It was followed in both the North Atlantic & Gulf Steamship Co., supra, and Marine Chartering Co., supra, cases cited by Cooper, as well as in Ocean Cargo Lines, Ltd. v. North Atlantic Marine Co., supra.[12]

■ Maritime liens may be created by general maritime law, state statute or the Maritime Lien Act of 1910 (amended and reenacted as part of the Ship Mortgage Act of 1920).[13] No claim is made that state law created the lien asserted by Cooper. The Maritime Lien Act was not intended to change the general principles of the law of maritime liens,[14] but merely to create a simpler body of rules for the enforcement of liens in favor of those who supply necessaries to ships.[15] It can be argued that therefore both the general maritime lien and the statutory lien continue to co-exist,[16] although Gilmore and Black say, "[W]e have now reached a point where it is fair to say that for most types of contract liens a uniform pattern has been established, with the Lien Act being looked to as the source of law and the state liens and non-statutory general maritime liens all but forgotten." [17] At any rate there appears to be no distinction between general maritime law and the Maritime Lien Act with respect to the issues here involved. When the charter contains the "prohibition of lien" clause, it is equally effective to prevent liens under either general maritime law or the statute.

Therefore Cooper could obtain no maritime lien on the subfreights because it could obtain no lien on the vessel itself.

The Clerk will prepare an order that the funds held in the registry in admiralty action number 7794 be disbursed in the following manner:

(1) $20,000.00 to be retained in the registry to be used for the sole purpose of satisfying any definitive judgment entered in any American court having jurisdiction upon confirmation of an award by a Board of Arbitration in favor of A/S D/S DANNEBROG (C. K. HANSEN) and against Admiralty or its trustee for charter hire and other amounts due that constitute a maritime lien upon the subfreights of M/V ARISTODIMOS earned for cargo carried aboard the vessel arriving at New Orleans on or about November 17, 1965, or to satisfy the amount to be paid A/S D/S DANNEBROG (C. K. HANSEN) pursuant to a consent order entered by such a court;

(2) The excess over and above the $20,000.00 retained, or $79,487.07, to be paid to James W. Walsh, Trustee for Admiralty.

At such time as the amount required to satisfy the claims of the A/S D/S DANNEBROG (C. K. HANSEN) has been determined, the Court will entertain a motion that the balance of the $20,000.00 be paid to Admiralty's trustee.

---

12. See also Robinson, Handbook of Admiralty Law (1939) at p. 401, in which the author states, "In general, whatever liens wharfingers, stevedores, and such persons may have, they have against the ship rather than against the cargo which they handle."

13. 46 U.S.C.A. §§ 971–975.

14. Except to eliminate the doctrine of the General Smith, 1819, 17 U.S. (4 Wheat.) 438, 4 L.Ed. 609, and The St. Jago de Cuba, 1824, 22 U.S. (9 Wheat.) 409, 6 L.Ed. 122.

15. Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 1920, 254 U.S. 1,

11–12, 41 S.Ct. 1, 65 L.Ed. 97 (Brandeis, J.). W. A. Marshall & Co. v. The President Arthur, 1929, 279 U.S. 564, 568, 49 S.Ct. 420, 73 L.Ed. 846, Senate Report, No. 831, 61st Cong., 1st Sess. See also Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 1940, 310 U.S. 268, 272–273, 60 S.Ct. 937, 84 L.Ed. 1197.

16. Cf. City of Erie v. S.S. North American, W.D.Pa.1967, 267 F.Supp. 875, 877. See also Schilling v. A/S D/S Dannebrog, 2 Cir., 1963, 320 F.2d 628, 633 n. 4.

17. Gilmore and Black, The Law of Admiralty 539 (1957).