138 B.R. 314 (1992)
In the Matter of TOPGALLANT LINES, INC., Debtor.
AMBASSADOR FACTORS, DIVISION FLEET FACTORS CORPORATION, Plaintiff,
v.
FIRST AMERICAN BULK CARRIER CORPORATION, et al., Defendants.
Bankruptcy No. 89-41996, Adv. No. 90-4072.
United States Bankruptcy Court, S.D. Georgia, Savannah Division.
February 5, 1992.
*315 John M. Tatum, Miller, Simpson & Tatum, Savannah, Ga., Joseph Moscou, Mineola, N.Y., for Ambassador Factors.
Marvin Fentress, for Association of Maryland Pilots.
C. James McCallar, Jr., Savannah, Ga., for Central Trailer Rentco,
Christopher Drummond, Milissa A. Murray, Annapolis, Md., for Ceres Marine Terminals, Inc.
Robert S. Glenn, Jr., Marvin Fentress, for Coastal Container Repairs, Inc., Moran Towing of Maryland, Inc., Moran Towing and Transp., Moran Towing of Virginia, Inc., M & S Mehtrens & Schwickerath GmbH, Redcliffe Intern. Ltd., Stute Intern., Inc., Virginia Pilots Ass'n.
C. James McCallar, Jr., Savannah, Ga., for CTG Rotterdam B.V.
David W. Skeen, Baltimore, Md., Robert S. Glenn, Jr., Savannah, Ga., for Egan Marine Contracting Co., Inc.
Richard C.E. Jennings, Savannah, Ga., for Fileccia, Peter & Virginia.
C. James McCallar, Jr., Savannah, Ga., Judy G.Z. Lieu, Weil, Gotshal & Manges, New York City, for Europe Combined Terminals, B.V., Rogiers Vereniging Eendracht Boatmen Assoc.
Thomas A. Dillon, Jr., New York City, Stephen R. Beckham, Chattanooga, Tenn., Kathleen Horne, Savannah, Ga., for First American Bulk Carrier.
David Popowski, Charleston, S.C., for General Container Services.
Herman W. Coolidge, Savannah, Ga., Martin H. Minsky, New York City, for Hampton Shipbrokers, Ltd.
Robert Glenn, Jr., Marvin Fentress, Savannah, Ga., Douglas M. Muller, Charleston, S.C., for Harbor Marine Supply, Maher Terminals, Inc., Virginia Intern. Terminals, Inc.
George H. Chamlee, Savannah, Ga., for Itel Containers Intern. Corp.
George L. Lewis, Savannah, Ga., William C. Miller, Philadelphia, Pa., for LSAI's Holdings, Inc.
M.J. Mintz, Washington, D.C., Kathy Horne, Savannah, Ga., for Marine Engineers Beneficial Assoc.
Gordon Schreck, Charleston, S.C., for Marine Line Handlers, Inc., McAllister Towing, Charleston Div., Russell C. Mitchum, Jr., Pete and Pat's Laundry Serv., White Stack Towing & Transp. Co., Inc.
Paul Felser, Savannah, Ga., for MBS Diesel-Sulzer Diesel.
Kathy Horne, Savannah, Ga., for MEBA Medical and Benefits Plan.
Marvin Fentress, Savannah, Ga., for Pilots Ass'n for the Bay and River Delaware.
Healy & Baillie, New York City, for Plimsoil Oil Corp.
Beck, Halberg & Williamson, New York City, for Messrs. Rooss, Sweeney, Peters, Haggerty, Graham, Pennea, Kanenbley and McGovern and Messrs. Wood, Ferrei, Newman and Tuthill.
M. Tyus Butler, Jr., Walter C. Hartridge, Savannah, Ga., for Southeastern Maritime Co.
Jan R. Gilbert, Savannah, Ga., for Topgallant Lines, Inc.
W.S. Victter, Rotterdam, The Netherlands, for Trefoil Trading BV.
*316 Walter C. Hartridge, Savannah, Ga., for Allsouth Stevedoring Co., Security Terminal Co.
MEMORANDUM AND ORDER ON AMBASSADOR FACTORS' SECOND AND THIRD SUPPLEMENTAL MOTIONS FOR SUMMARY JUDGMENT
LAMAR W. DAVIS, Jr., Chief Judge.

Findings of Fact
On November 22, 1985, The Connecticut National Bank, as trustee, chartered the M/V Delaware Bay, then known as the "American Ohio", to First American Bulk Carrier Corporation ("FABC"), in accordance with two bareboat charter parties, redacted copies of which are designed Exhibit "A" and Exhibit "B" to Plaintiff's Fourth Supplement to Uncontested Material Facts, filed February 13, 1991 (Document # 213).
On April 21, 1987, FABC subchartered the M/V Delaware Bay and the M/V Chesapeake Bay to Topgallant Group, Inc. a New York Corporation, in accordance with subbareboat charter parties, copies of which, as amended, are designated Exhibit "A" and Exhibit "B" to Plaintiff's Statement of Uncontested Material Facts, filed September 14, 1990 (Document # 162).
Commencing in 1987, Topgallant Group was in the shipping business, transporting goods on the two aforementioned vessels subchartered from FABC.
On March 31, 1989, Universal Shipping and Trading Company, Inc., predecessor corporation to Topgallant Lines, Inc., was incorporated.[1] In connection therewith, Topgallant Group assigned to the Debtor its rights under the subcharters with FABC and the Debtor assumed Topgallant Group's obligations thereunder.
On April 19, 1989, Plaintiff Ambassador Factors entered into a Security Agreement with Universal Shipping and Trading Company, Inc., d/b/a Topgallant Lines, a Georgia Corporation, as evidenced by Exhibit "C" to Plaintiff's Statement of Uncontested Material Facts, dated September 14, 1990 (Document # 162).
On May 10, 1989, Ambassador filed a Uniform Commercial Code Financing Statement with the Secretary of State of New Jersey, naming "Universal Shipping & Trading Co., Inc., d/b/a Topgallant Lines." A copy of said Financing Statement is attached as Exhibit "1" to the Stipulated Statement of Uncontested Material Facts Between Plaintiff, Ambassador Factors, Division, Fleet Factors Corporation, and Defendant, First American Bulk Carrier Corporation, filed on March 1, 1991, hereinafter referred to as "Stipulation 1" (Document # 222).
On May 12, 1989, Universal Shipping and Trading Company, Inc., changed its corporate name to "Topgallant Lines, Inc." as evidenced by Exhibit 2 to Stipulation 1 (Document # 222).[2]
By separate addenda dated June 30, 1989, each known as "Addendum No. 4", the aforesaid charter parties were amended and assigned by Topgallant Group, Inc., to Topgallant Lines, Inc. Copies of said addenda are included with Exhibit "A" and Exhibit "B" to Plaintiff's Statement of Uncontested Material Facts, filed September 14, 1990 (Document # 162).
On August 18, 1989, Ambassador Factors filed a UCC-1 Financing Statement with the Clerk of the Superior Court of Chatham County naming "Topgallant Lines, Inc., c/o Southeastern Marine Company" as debtor and Ambassador as secured party as evidenced by Exhibit "3" to Stipulation 1 (Document # 222).
*317 On August 30, 1989, Ambassador filed a UCC-1 Financing Statement with the Secretary of State of New Jersey, naming "Topgallant Lines, Inc., c/o Maher Terminal" as debtor and Ambassador as secured party as evidenced by Exhibit "4" to Stipulation 1 (Document # 222).
On December 13, 1989, Topgallant Lines filed a petition under Chapter 11 of the Bankruptcy Code with this Court, Case Number 89-41996. On that date, the M/V Chesapeake Bay was in Bremerhaven, West Germany, and the M/V Delaware Bay was enroute to Europe from Charleston, South Carolina. Also, on December 13, 1989, Topgallant Group filed a Petition under Chapter 11 of the Code, Case Number 89-41997.
Topgallant Lines' accounts included freights and other accounts due from the Military Sealift Command ("MSC") pursuant to MSC contract # N0003380C9013 and the contract rights thereto. On February 16, 1990, Debtor initiated an adversary proceeding against the MSC, seeking turnover of certain sums allegedly due under the MSC contract. On April 30, 1990, MSC paid $708,326.00 into a sequestered account pursuant to Order of this Court. The Debtor's Trustee claims additional funds are due under this contract in other litigation pending in this Court.
Other funds had been deposited into the sequestered account which constitute Topgallant's ocean "freights."
Defendants have filed proofs of claim, asserting that their claims are, in whole or in part, secured by maritime liens on Debtor's freights, including those held in the sequestered account. Ambassador disputes the lien status and the priority of those claims and seeks a determination in this Court that its UCC security interest in accounts receivable makes Ambassador the first priority lienholder in the freights.
On June 30, 1989, Plaintiff assumed, as lessee, "THE TOPGALLANT GROUP, INC./ITEL CONTAINERS INTERNATIONAL CORPORATION MASTER INTERCHANGE AGREEMENT" dated May 18, 1988 (copy attached to Itel's proof of claim).
On December 18, 1989, post-petition, an order for the seizure of the M/V Delaware Bay and the M/V Chesapeake Bay was obtained in the Bremerhaven Municipal Court by the Association of Maryland Pilots and the Pilots Association for the Bay and River Delaware. (Exhibit "6" to Stipulated Statement of Material Facts submitted March 1, 1991, hereinafter referred to as Stipulation 2 (Document # 223).) Affidavit of Dr. Karl F. Puchta dated February 8, 1991 (Document # 216).
Bank guarantees dated July, 1990, were furnished in the Fall of 1990 in order to secure the release of the two vessels from the attachments of those two creditors who were entitled to assert maritime liens under German Law and other claimants who had attached the vessel but have no maritime lien rights under German Law. Puchta Affidavit (Document # 216). The following parties have been furnished with bank guarantees:
1) Association of Maryland Pilots
2) Ceres Marine Terminals, Inc.
3) Plimsoll Oil Corporation
Stipulation 2, ¶ 2-4, Exhibits 6-8 (Document # 223).
The following Defendants have been furnished bank guarantees in substantially the same form as the foregoing except for the monetary amount of the guarantee:
1) Europe Combined Terminals;
2) Harbor Marine Supply;
3) Maher Terminals, Inc.;
4) Pilot's Association for the Bay and River Delaware;
5) Rogiers Vereniging Eendracht Boatmen Association;
6) Fuji Trading Company, Ltd.
Stipulation 2, ¶ 5. These Defendants will be collectively referred to as the German claimants.
When the vessels departed from Bremerhaven in the fall of 1990, they resumed trading between Europe and the United States. At times when the vessels were scheduled to call at United States ports, certain Defendants, who are maritime lien claimants in this proceeding, threatened to *318 commence proceedings in rem against the vessels in Federal District Courts located in East Coast ports of the United States. In order to avoid in rem arrest of the vessels in various United States ports between September 25, 1990, and October 15, 1990, FABC furnished to certain Defendants letters of undertaking of St. Paul Fire and Marine Insurance Company. These letters of undertaking were furnished to the following Defendants:
1) Coastal Container Repairs, Inc.
2) Egan Marine Contracting Company, Inc.
3) Hampton Shipbrokers, Ltd.
4) Itel Containers International Corp.
5) Marine Line Handlers, Inc.
6) McAllister Towing Charleston Division
7) Russell C. Mitchum, Jr.
8) Pete & Pat's Laundry Service
9) Redcliffe Americas, Ltd.
10) Virginia International Terminals
11) Virginia Pilots Association
12) White Stack Towing & Transportation Company, Inc.
Stipulation 2, ¶ 7-18, Exhibits 9-20 (Document # 223).
The following Defendants have furnished "letters of undertaking" in the identical form as the foregoing except for the monetary amount and the jurisdiction of the letter of undertaking:
1) Allsouth Stevedoring;
2) Moran Towing and Transportation Company, Inc.;
3) Moran Towing of Maryland, Inc.;
4) Moran Towing of Virginia, Inc.
Stipulation 2, ¶ 19. These Defendants will be collectively referred to as the United States Claimants.
On or about February 5, 1991, FABC paid in full the claims of Russell C. Mitchum, Jr., and Pete and Pat's Ship's Laundry Service, each of said payees having claimed a maritime lien and having filed a proof of claim in this bankruptcy case. Stipulation 2, ¶ 20, Exhibits 21 and 22 (Document # 223).

DISCUSSION
In this action the parties seek a determination of the extent, validity, and priority of their respective claims against freights of the Debtor. This Order will consider the Second and Third Supplemental Motions for Summary Judgment filed by Ambassador Factors (Documents # 186 and # 197). By previous orders on Ambassador Factors' Motions for Summary Judgment and the counter Motions for Summary Judgment of FABC, I have ruled that Ambassador has a valid, perfected UCC security interest in freights, Ambassador Factors, et al. v. First American Bulk Carrier Corp., et al., AP # 90-4072, Order dated July 15, 1991 (Document # 237), and that valid maritime liens held by various claimants in freights are superior to the consensual UCC security interest of Ambassador. Ambassador Factors, et al. v. First American Bulk Carrier Corp., et al, AP # 90-4072, Order dated Jan. 31, 1991 (Document # 208) 125 B.R. 682 (Bankr. S.D.Ga.1991).
Ambassador, by its Second and Third Supplemental Motions for Summary Judgment contends that, notwithstanding my ruling that maritime liens are superior to UCC security interests, in this case Ambassador's UCC security interest is superior to that of numerous defendants who held arguably valid maritime liens against debtor's vessels and their freights but extinguished those lien rights by the acceptance of security in lieu of seizure of the vessels. FABC and other defendants argue that the agreement to forego a seizure or release of a vessel upon the furnishing of security in the form of a bond or letter of undertaking, while it may divest the vessel of any maritime liens, does not divest lien claimants of their separate lien on freights of the vessel.
It is clear that a valid maritime lien on a vessel extends to the freights earned by the vessel. The central question to be decided on this motion is whether, after a valid lien on a vessel and its freights arises, the lien as to freights is automatically extinguished upon release of the vessel or an enforceable waiver of the right to arrest *319 the vessel, or whether the lien on freights survives notwithstanding the release of lien as to the vessel.
It is uncontradicted that letters of undertaking were issued to the United States claimants which provided in relevant part:
In consideration of the claimant refraining from arresting or attaching the above-named vessel or any other vessels or property of the registered owner . . . with respect to claims in rem against the vessel arising from goods or services furnished by claimant pursuant to orders from Topgallant . . . the undersigned company hereby agrees . . .
(2) In the event a final decree . . . be entered in favor of claimant against the vessel . . . then the undersigned company agrees to pay and satisfy, up to but not exceeding $____. . . .
 __________________________
 /s/ St. Paul Fire and
 Maritime Insurance Co.
Likewise bank guarantees were issued to the German claimants which read:
In the seizure proceedings [case reference] . . . the decision of 12/18/89 has ordered the seizure of the M/V `Chesapeake Bay' in the harbor of Bremerhaven. According to this resolution, the respondent [FABC] is entitled to have the seizure lifted by depositing a total of DM 300,000.00. . . . We hereby unconditionally, inevocably and absolutely and without time limit, stand security for the respondent. . . . as surety for all claims for which the seizure was ordered. . . .
 ________________________
 /s/ Deutsche Bank, A.G.,
 in Hamburg

CONCLUSIONS OF LAW
A review of all the authorities presented reveals no controlling authority arising out of a factually identical case. Perhaps the following observations on another issue were prescient: "Since the admiralty bar and the personal property security bar have little or no contact with each other, it may well be that the argument will never be made. If made it would present some nice questions of law." Gilmore & Black on Admiralty, § 9-21 at 635.
Likewise, Gilmore and Black editorialize on the usefulness of precedent in a related area of admiralty litigation:
The fact that there has been almost no priority litigation for more than a generation makes `the law' of the subject even more obscure than it may have been when the several judges quoted at the head of the section were considering it. In a priority case today, the most recent authority on any point will probably be a case decided by a District Judge thirty or forty or fifty years ago. Technological, organizational and financial changes in the method of carrying on the shipping business have been many and important. Precedents dredged from the dusty pages of the Federal Reporter (First Series) no longer have the weight they once had and lose a little more each year. Nor is there any reason to believe that there will be a substantial volume of priority litigation in the future.
Any analysis of maritime lien priorities must therefore be taken with a double caveat. Since priority litigation has been localized at the trial level, the discretion of the District Judge bulks much larger than doctrinal statement. Since there has been almost no priority litigation for a long time, the doctrinal statements, based as they must be on case law, are in any event out-of-date.
Gilmore & Black on Admiralty, § 9-60 at 737.
Notwithstanding the lack of clear and factually specific precedent, the rationale of cases cited by Ambassador support its contentions. In Southern Oregon Production Credit Assoc. v. The Oil Screw Sweet Pea, 435 F.Supp. 454 (D.Oregon 1977) the holder of a maritime lien accepted security following arrest of the vessel for an amount insufficient to cover its claim, as later determined. The lienholder partially satisfied its judgment from the security and subsequently asserted a lien priority for the balance, in proceeds of the sale of the vessel, as against the holders of preferred ships mortgages. The parties *320 agreed that absent the prior release of the vessel by the maritime lienholder, its claim would have had priority in the proceeds of the sale of the vessel. Nevertheless, as a result of the acceptance of the stipulation for value and the vessel's release, the Court ruled in favor of the ship's mortgage holders, holding the general admiralty law "clearly" favored the ship's mortgage holders.
[T]he effect of release is to transfer the lien from the ship to the fund represented by the bond or stipulation. The lien against the ship is discharged for all purposes and the ship cannot again be libeled in rem for the same claim.
Id. at 458, quoting Gilmore & Black, The Law of Admiralty, § 9-89 at 799. As a result the stipulation for value, bond, or letter of undertaking not to arrest a vessel is a complete substitute for the res. Id.
Applying "prevailing case law" the Court in Sweet Pea held that the lienholder's remedy is limited to the amount of the bond, that the discharge of the vessel occurred by operation of law, was not dependent upon the parties' intent, and was effective even if the lienholder made a mistake in understating the amount of its claim. 435 F.Supp. at 459. Clearly no actual arrest is required to reach the same result when a letter of undertaking is substituted in lieu of arrest. In Continental Grain Co. v. Federal Barge Lines, Inc., 268 F.2d 240 (5th Cir.1959), the Court recognized that the giving of security in lieu of arrest is common practice,
In accordance with the practice in . . . all major seaports of maritime litigation, the usual letter of undertaking was given . . .
Id. at 242. The Court held that upon the release of the vessel under bond:
[T]he lien on the vessel is discharged for all purposes, ceases to exist, and the release of the libel bond is the sole security.
Id. at 244. See Overstreet v. The Water Vessel "Norkong", 706 F.2d 641 (5th Cir. 1983); Industria Nacional Del Papel v. M/V Albert F., 730 F.2d 622, 625-26 (11th Cir.1984).
Likewise in Alyeska Pipeline Service Co. v. The Vessel Bay Bridge, 703 F.2d 381 (9th Cir.1983), the Court held that upon the posting of security the lien is transferred to the security posted. In the absence of fraud or misrepresentation the release of a vessel upon the posting of security discharges the lien against the vessel. Id. at 384. See Gray v. Hopkins-Carter Hardware Co., 32 F.2d 876 (5th Cir.1929) (It is a general rule that such a bond is a substitute for the vessel, and the vessel is thereafter discharged and freed from the liens involved in the suit). Once the vessel is released it can no longer be held to answer for the claims the bond is designed to meet. The bond is substituted as the sole fund for recovery. Overstreet, supra.; Industria Nacional, supra.
None of the above cases directly addresses the question of freights or the issue before me. However, I agree with the proposition that since the lien on freights is derivative of a lien on the vessel it cannot survive the lienholder's agreement to release its lien in the vessel. Clearly a lien on freights does not exist in a vacuum but is incidental to and dependent upon a lien on the vessel. Morgan Guaranty Trust Co. of New York v. Hellenic Lines, Ltd., 38 B.R. 987 (S.D.N.Y.1984); Schirmer Stevedoring Co., Ltd. v. Seaboard Stevedoring Corp., 306 F.2d 188 (9th Cir.1962); Gulf Oil Trading Co. v. Creole Supply, 596 F.2d 515, 521 (2nd Cir. 1979). Conceptually if the lien on freights cannot arise absent a lien on the vessel then the release of the vessel must necessarily release all lien rights to the freights. In re Admiralty Lines, Ltd., 280 F.Supp. 601 (E.D.La.1968) held that a stevedore asserting a maritime lien on a vessel whose charter contained a prohibition of lien clause was not only denied a lien on the vessel but on the freights. The stevedore argued that since the charter expressly prohibited liens on the vessel, it did not by implication prohibit liens on freights. This argument was rejected, the court holding that:
Neither the applicable statutes nor the traditional maritime law permits the subfreights *321 earned by a vessel to be subject to a lien apart from a lien on the vessel itself. The subfreights the vessel earns are for lien purposes an integral part of the vessel. They are no more subject to separate liens than the steel plates that are furnished to repair its hull or parts that are ordered to repair the winches to enable them to load the cargo.
Id. at 605.
Likewise in United States v. Robins Dry Dock & Repair Co., 13 F.2d 808 (1st Cir. 1926) lienors attempted to assert claims against freight despite the fact that they could not assert maritime liens against the vessel. The Court relied on authority that inasmuch as freight is regarded as belonging to the vessel, "an abandonment of the ship carries the freight along with it." Id. at 813. The Court stated that no authority had been presented wherein a lien was held to exist on freights when there was no lien on the vessel and as a result ruled that "if there was no lien on the ship, there can be no lien on the freight." Id. at 813-814. Since the only liens recognizable are "those created by statute and those historically recognized in maritime law," Admiralty Lines, 280 F.Supp. at 604-05, the fact that no separate freight lien has been historically recognized when no lien was available on the vessel is persuasive.
Defendants rely on language in Schirmer Stevedoring Co., Ltd. v. Seaboard Stevedoring Corp., 306 F.2d 188 (9th Cir.1962) that "[m]aritime liens may be obtained against freights independent of any lien against the vessel" as supporting their position on this motion. However, I agree with Ambassador that Schirmer is inapplicable to the question before me. In Schirmer the owner was expressly granted a lien for charter hire on all freights earned. It is uncontradicted that FABC which occupies the status of owner for the purposes of this motion did not have such a contractual lien on freights.
Schirmer affirmed the award of freights to the owner only because the owner had such a contractual lien on freights under the charter. As to the other Defendants holding lien claims, however, Schirmer reaffirmed the rule that the lien for their services on freights was valid only to the extent they held a lien against the vessel. That is, as to third-party lien claimants Schirmer recognizes no independent lien on freights, and supports, by inference, Ambassador's position.
Defendants cite authority for the proposition that even after sale of a vessel, maritime liens may attach to freights of the vessel and contend that those holdings necessarily contemplate that liens on freights may be maintained separate and distinct from and after extinguishment of a lien against the vessel. In The Brig Wexford, 7 F. 674 (S.D.N.Y.1881) a libel was filed against vessel and freights for seaman's wages. Process issued only against the vessel and proceeds of sale were paid to the registry of court. Claims of various libellants exceeded the funds recovered. Freights were attached in a separate in personam action by another creditor. The Court approved payment of that claimant and had $630.00 in freights remaining. It held that the funds were subject to the lien for seaman's wages both because their libel had been filed against the vessel and its freight, and under a marshalling theory. At best, the facts and the holding in Wexford are difficult to unravel, but clearly, there was no ruling on a direct challenge to the lien claimant's interest in freights and, contrary to the quote in FABC's proposed order filed March 25, 1991 at page 9, I see no explicit language in Wexford establishing that the sale of the vessel came before the freight was attached. See also Letter Brief of Thomas A. Dillon, Jr., dated March 7, 1991.
In Huntington v. The Freights of the Vigilancia, 63 F. 733 (S.D.N.Y.1894) freights of four vessels were libeled on April 13, 1893.[3] Three of the ships which *322 earned the freights had previously been sold on April 3, 1893. The final ship was later sold in December, 1893. The Court nevertheless ordered distribution of all the freights according to the priority rules of the decision in Freights of the Kate. From the text of the case it is not clear what defenses were asserted by the holders of collateral assignments against the lien claimants. Clearly there was no analysis by the Court whether the prior sale of some of the vessels extinguished the maritime liens on some or all of the freights. Moreover, it is clear that the freights in issue were originally deposited under a "stipulation" to "abide the decision of that action" (a state court action in equity filed in February 1893, prior to the vessel's sale). The terms of the stipulation are unknown and the only issue expressly resolved contrary to the holders of collateral assignments in freights was that their advances were made prior to the final voyage and thus, were inferior to maritime lienors who had furnished necessities on the final voyage. Since the freights were originally attached in a state court action in February 1893 (pre-vessel sale) and later libeled in admiralty after sale of three of the four vessels and since there was no challenge to the validity of the maritime liens it is likely that by their stipulation the parties agreed to a resolution of their rights as of the date of the first state court attachment.
Accordingly, while the result reached as to some freights is the same as that urged by Defendants in this case, there is no holding by that Court which controls or even sheds light on the issue before me. Defendants would have me conclude that their position is so well recognized in admiralty that no one has ever litigated the issue. That may be so, but it is an inference I am unable to adopt since it is contrary to general admiralty concepts on which Ambassador relies.
Defendants also argue that in Ramsay Scarlett & Co., Inc. v. S.S. KOH EUN, 462 F.Supp. 277 (E.D.Va.1978) the Court held that the release of the ship by posting of security had no effect on Ramsay's lien for stevedoring services on freights which were ordered applied to payment of the lien. To the contrary, as I read the case, Ramsay, the stevedore, attached the vessel in rem in November of 1977. Ramsay had taken an assignment of freights due the ship as "advance payment" for services. Id. at 283. Ramsay also filed a garnishment action to attach pre-paid freights in the hands of a freight forwarder which were due to the ship. Without order of court those monies, less commissions, were paid to Ramsay in the amount of $89,640.01 and Ramsay dismissed its garnishment. The admiralty court upheld Ramsay's lien claim for stevedoring services despite the assertion of a prohibition of lien defense, calculated the balance due Ramsay to be $6,434.00 after crediting the ship for funds captured through the garnishment, entered judgment in rem for that amount and ordered that the judgment in rem be satisfied from the stipulation for value filed in order to obtain the release of the vessel. Nowhere does it appear that the Court upheld a maritime lien on freights, post-release of the vessel as Defendants argue. Instead, because Ramsay had been paid through non-admiralty collection efforts founded on its land-based assignment of freights the Court simply credited the ship's account, entered an in rem judgment only for the balance due, and attached that judgment only to the vessel or its substitute collateral. While Ramsay's claim was indeed paid with money that constituted freights it was not paid as a result of a judgment that its in rem lien on freights had survived the release of the vessel under bond. Ramsay clearly supports Defendants' position only in the mathematical result, not in the holding.
Finally, in Morgan Guaranty Trust Co. of New York v. Hellenic Lines, Ltd., 585 F.Supp. 1227 (S.D.N.Y.1984) from a review of facts outside the reported decision it appears that the district court sitting in admiralty ordered payment of freights into the registry of court after the in rem sale of the vessels which earned them had been ordered but prior to the actual sale date. (Letter Brief of Tom Dillon dated March 7, 1991). However, the freights had already been arrested by a maritime lien claimant *323 and the only issue resolved was whether the freights were to be administered in admiralty by the court in which the arrest occurred or by the Bankruptcy Court in which the vessels' owners had filed a Chapter 11 and converted to Chapter 7. Based on the doctrine of custodia legis the district court ordered delivery of the freights to the registry for further proceedings in admiralty. Clearly Hellenic Lines stands for less than Defendants assert. Mr. Dillon's letter refers to attachments which show that the freights were distributed after the vessel sale. However, that disbursement was the result of a settlement. I would welcome a settlement in this case. However, none is in prospect. Called upon as I am to decide legal issues, I am not bound or persuaded by the contents of a settlement reached by other parties in another court, in another case. The settlement terms of Hellenic Lines are irrelevant. The holding of Hellenic Lines is inapposite.
Having carefully considered these and other authorities cited by the parties I conclude that Ambassador's argument is compelling. The general admiralty concepts on which it relies lead inescapably to the conclusion that as the vessel and its freights are one, the existence of a lien on the former is essential to the latter. The only distinct or independent lien on freights exists in favor of an owner who has contractually reserved such a lien and in this case FABC has no such rights. The cases relied on by FABC are neither controlling nor persuasive for the reasons set forth herein and as a result Ambassador is entitled to summary judgment against all United States and German claimants who received bank guarantees or letters of undertaking.
As to FABC, its claim against the freights is not founded upon assertion of a maritime lien in its own right. As previously noted FABC as disponet owner retained no lien rights on freights under its charter party. FABC, however, claims that it is entitled to be subrogated to the rights of maritime lien claimants to the extent it satisfies those claims. 11 U.S.C. § 509. On its face Section 509 appears to support FABC's contentions. However, I agree with Ambassador that notwithstanding the facial applicability of Section 509, FABC derived no lien rights upon its furnishing of security or payment of the lien claims. It is axiomatic that FABC's rights as subrogee rights are derivative and that it obtains no greater rights than those held by the party subrogated (the lien claimants). In re Levitz Electric, Inc., 100 B.R. 602 (Bankr.S.D.Fla.1989); In re Denby Stores, Inc., 86 B.R. 768 (Bankr.S.D.N.Y. 1988). See generally American Surety Co. v. Bethelem National Bank, 314 U.S. 314, 317, 62 S.Ct. 226, 228, 86 L.Ed. 241 (1941).
Since, however, I have ruled that as a matter of law the furnishing of security in exchange for an agreement to release or not to arrest the vessel discharges the maritime lien in both the vessel and freights otherwise held by the claimants, the claimants retained no further lien rights and FABC cannot acquire, by subrogation, what the lien claimants discharged and released. The holding of In re Russell, 101 B.R. 62 (Bankr.W.D.Ark.1989) compels no different conclusion. In that case the Court expressly recognized that "the party paying the debt" (FABC) is entitled to all the rights and remedies which the creditor (maritime lienors) held against the party which should have paid (Topgallant). Id. at 64. However, in this case FABC has only paid two maritime lien claims, those payments came long after the maritime liens were discharged by the furnishing of letters of undertaking, and as to all other maritime lien claims payment has yet to be made. Thus, as of the time of payment made or to be made, all maritime liens had been released and discharged and FABC acquired no lien rights by subrogation. Alternatively, I agree that FABC as disponet owner cannot hold a maritime lien in its own vessel. Sasportes v. M/V Sol De Copacabana, 581 F.2d 1204, 1207 (5th Cir. 1988) (reversing the trial court's finding that Star Kist was a joint venturer, but adopting the legal proposition stated); Gilmore *324 & Black, § 9-20 & 21 at 626, 633-635.
Inasmuch as my ruling here is dispositive of the lien status of the Itel claim it is unnecessary to address the independent ground on which summary judgment was sought against Itel in Plaintiff's Supplemental Motion for Summary Judgment (Document # 185).

CONCLUSION
For the foregoing reasons, I hold that claims by Defendants, First American Bulk Carrier Corporation, Egan Marine Contracting Company, Inc., Hampton Shipbrokers, Ltd., Itel Containers International Corp., Marine Line Handlers, Inc., McAllister Towing, Charleston Division, Russell C. Mitchum, Jr., Pete & Pat's Laundry Service, White Stack Towing & Transportation Company, Inc., Coastal Container Repairs, Inc., Redcliffe Americas, Ltd., Virginia International Terminals, Virginia Pilots Association, Allsouth Stevedoring, Moran Towing and Transportation Company, Inc., Moran Towing of Maryland, Inc., Moran Towing of Virginia, Inc., Ceres Marine Terminals, Inc., Plimsoll Oil Corporation, Association of Maryland Pilots, Europe Combined Terminals, Harbor Marine Supply, Maher Terminals, Inc., Pilot's Association for the Bay and River Delaware, Rogiers Vereniging Eendracht Boatmen Association, and Fuji Trading Company, Ltd., are not entitled to maritime lien status and the Motion for Summary Judgment of Ambassador Factors is granted.
The claim of Ambassador Factors is secured by a valid perfected UCC security interest in freights of the Debtor. Said security interest is superior to the claims of First American Bulk Carrier Corporation, Egan Marine Contracting Company, Inc., Hampton Shipbrokers, Ltd., Itel Containers International Corp., Marine Line Handlers, Inc., McAllister Towing, Charleston Division, Russell C. Mitchum, Jr., Pete & Pat's Laundry Service, White Stack Towing & Transportation Company, Inc., Coastal Container Repairs, Inc., Redcliffe Americas, Ltd., Virginia International Terminals, Virginia Pilots Association, Allsouth Stevedoring, Moran Towing and Transportation Company, Inc., Moran Towing of Maryland, Inc., Moran Towing of Virginia, Inc., Ceres Marine Terminals, Inc., Plimsoll Oil Corporation, Association of Maryland Pilots, Europe Combined Terminals, Harbor Marine Supply, Maher Terminals, Inc., Pilot's Association for the Bay and River Delaware, Rogiers Vereniging Eendracht Boatmen Association, and Fuji Trading Company, Ltd. Said lien is inferior to valid maritime liens held by all other Defendants as may hereafter be determined.
In accordance with Bankruptcy Rule 7054 I have determined that there is no just reason for delay in the entry of final judgment as to the claims determined by this Order, as well as my Orders dated January 31, 1991 (Document # 208) and July 15, 1991 (Document # 237) in this case. I therefore direct entry of final judgment as to all claims adjudicated and parties affected by these Orders.
NOTES
[1] FABC's first Statement of Undisputed Material Facts, attached to the Motion of First American Bulk Carrier for Partial Summary Judgment, filed September 5, 1990, states "Topgallant Lines, Inc., (the `Debtor'), was incorporated on or about March 31, 1989, and thereafter took over Group's business. . . ." However, "Topgallant Lines, Inc." was not in existence until Universal amended its articles of incorporation with the Georgia Secretary of State. That document does verify the March 31st date. Ambassador did not specifically respond to this "fact" and it is deemed admitted.
[2] The parties stipulated to May 12th which is the date the certificate was executed. However, the certificate cites May 5th as the date of amendment.
[3] Although the year 1894 appears on page 733 of the decision, 1893 is stated as the year on page 734 and in light of the sequence of events must be the correct date. However, these facts are gleaned only by reference to a companion case at 63 F. 726. No analysis of the effect of those prior sales was made in either decision.