**Vernon A. STONE, Plaintiff-Appellant Cross-Appellee,**

v.

**BOARD OF REGENTS OF the UNIVERSITY SYSTEM OF GEORGIA et al., Defendants-Appellees Cross-Appellants.**

**No. 78–1393.**

United States Court of Appeals, Fifth Circuit.

July 3, 1980.

J. Hue Henry, Athens, Ga., for plaintiff-appellant cross-appellee.

Alfred L. Evans, Asst. Atty. Gen., Atlanta, Ga., for defendants-appellees cross-appellants.

Before GEE, TJOFLAT and ANDERSON, Circuit Judges.

GEE, Circuit Judge:

The University of Georgia hired Vernon Stone in 1974 as part of the university's effort to strengthen its School of Journalism by appointing three senior professors who would have sufficient scholarly stature to provide leadership in the school. At that time Stone was a teacher at the University of Wisconsin, earning $19,000 per year. Stone's starting salary with the University of Georgia was $30,000 per academic year.

At the time of suit, Stone was a tenured,[1] full professor at the University of Georgia and was earning around $32,000 per academic year, having received a series of one-year contracts and periodic raises. Each academic-year contract explicitly stated that it was for three quarters only and that a separate contract would be issued if the university desired an employee's services during the fourth, or summer, quarter. During negotiations for his initial contract, the Dean of the School of Journalism, Warren Agee, wrote to Stone and, among other things, assured him that he could "expect the usual across-the-board and merit increases [in salary], in keeping with normal University and school practices."

Agee resigned as Dean of the School of Journalism in 1975, and President Fred C. Davison appointed Scott M. Cutlip to serve as Acting Dean. Provost S. W. Pelletier selected a search committee for a new permanent dean, which committee included Vernon Stone as one of its members. Stone alleges that he and the other committee members attempted to recruit minority and female candidates for the position of dean and that this effort was frustrated by Acting Dean Cutlip's conduct during the dean search. Evidently Cutlip announced at first that he would not be a candidate for permanent dean and later changed his mind when he felt the committee had not come forward with qualified candidates. During the course of the dean search, it seems that Stone and Cutlip had several disagreements about how the search should be carried out and about the value of the search committee's efforts. At any rate, the dean search culminated in mid-1976 with Cutlip's appointment as the new permanent dean.

Stone learned in the late spring of 1977 that he would receive a pay raise of 2.5 percent for the 1977–78 academic year, and his request for summer teaching was denied. After his complaints to the university

---

1. Stone was given tenure in 1976.

administration failed to change the situation, Stone brought an action in state court for mandamus and injunctive relief concerning summer employment for 1977 and for damages for breach of contract. The state court denied mandamus and injunctive relief, and Dr. Stone took a voluntary dismissal without prejudice of his contract claim. Immediately after that dismissal, Stone filed the instant suit in federal court, alleging violations of his first and fourteenth amendment rights under color of state law and seeking injunctive relief, as well as money damages. Named as defendants were the Board of Regents of the University System of Georgia, President Davison, and Dean Cutlip. Among other things, Stone charged that defendants denied him a hearing in violation of his rights to procedural due process[2] and retaliated against his exercise of first amendment rights to free speech and association.[3]

After some discovery had taken place, the federal district court converted defendants' motion for judgment on the pleadings to a motion for summary judgment and allowed all parties 30 days to file additional Fed.R.

Civ.P. 56 materials. Both sides submitted affidavits. The trial court granted defendants' motion for summary judgment in early January 1978, and Stone appeals.

Appellant first urges us to remand for specific findings, since the trial court's one-sentence order granting summary judgment contained no reasons for its action. While Federal Rule of Civil Procedure 52(a) states that "[f]indings of fact and conclusions of law are unnecessary on decisions of motions" under Rule 56, this court has held that, if a reviewing court cannot tell from the order and from the record the grounds on which summary judgment was granted, effective review may be impossible. *See Soley v. Star & Herald Co.*, 390 F.2d 364 (5th Cir. 1968). However, *Soley* does not control here, since the record below clearly reveals that summary judgment was proper in this case.

Defendants raised several issues and defenses in their answers, motions, trial briefs, and affidavits in support of their motion for summary judgment.[4] We find one of these defenses—lack of causation—compelling.[5] In an uncontroverted affida-

---

**2.** Stone claims entitlement to summer employment in 1977 because of certain alleged oral promises made by Cutlip in 1976. Furthermore, the letter from Dean Agee, it is claimed, affords Stone a legitimate expectation of salary increases equal to those received by other faculty members. *See Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). We do not believe the Agee letter can be fairly read as promising more benefits than Stone received. In any event, under the facts and circumstances of this case, the trial court could have found that Stone had been accorded procedural due process by virtue of a meeting held in Dean Cutlip's office on May 12, 1977, Stone's personal appeal to the chancellor, and the availability of grievance procedures within the university.

We express no opinion on the probable outcome of a breach of contract action, should Stone choose to bring one.

**3.** Stone's speech and conduct as a member of the search committee would be constitutionally protected if addressed to a matter of public concern, even if expressed privately. *See Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Lindsey v. Board of Regents*, 607 F.2d 672 (5th Cir. 1979). For our purposes, we accept as true Stone's assertions that he and Cutlip disa-

greed over Stone's attempts to find qualified minority and female dean candidates and Cutlip's interference with those attempts. Such a disagreement would have sufficient "public" flavor to merit protection. We also note that Dr. Hardy Edwards, chairman of the search committee, stated in his deposition that he was concerned about a letter from the leading female candidate detailing possible irregularities in the search process; Edwards recommended to President Davison that the Equal Employment Opportunity Office be asked to investigate whether each of the candidates had received fair treatment. This testimony supports Stone's description of his concerns during the search.

**4.** Defendants raised, as their major defenses, res judicata (based on the suit in state court), eleventh amendment immunity (inapplicable to the individual defendants), the absence of a legally cognizable injury to any recognized constitutional right, and lack of causation. We reach only the last-mentioned issue.

**5.** Defendants bear the burden in this appeal, since they are the parties seeking to sustain an "unarticulated" summary judgment. *Soley v. Star & Herald Co.*, 390 F.2d at 367–68.

vit, Dean Cutlip stated that he allocated the funds budgeted for salary increases and the available summer jobs so as to give additional compensation to the lowest paid faculty members in an effort to "retain highly competent yet extremely underpaid faculty members, and also to mitigate salary differences." Some faculty members in the School of Journalism earned as little as $11,500 to $14,000, while Stone and a few others drew in excess of $30,000 per academic year. In carrying out his policy, Dean Cutlip decided to deny summer teaching opportunities to *all* faculty members receiving over $30,000 per academic year and to restrict pay raises for *all three* faculty members falling within that category to 2.5 percent. Evidently, faculty members in the lower pay brackets received a raise of approximately 9.5 percent. Cutlip asserted that Stone's salary bracket *alone* would have dictated that he receive only a 2.5

percent increase for 1977–78, regardless of Cutlip's feelings toward Stone.[6]

█ For the sake of this discussion, we will assume that the denial of any increase in salary, or the granting of an allegedly inadequate raise, if done in retaliation for the exercise of a professor's first amendment rights, is an actionable injury, although we do not decide that question here.[7] Moreover, we will cast the best possible light on Stone's allegations and affidavits so that they support his claim that exercise of his first amendment rights played a substantial part in the decision to deny him a larger salary increase. Even so, we believe that Cutlip's affidavit, along with the deposition testimony of Professor Ernest Hynds, established without contradiction that defendants did not single out Stone for special, retaliatory treatment. Instead, the decision clearly seems to have been made for other, permissible reasons.[8]

**6.** Cutlip also asserted that Stone's teaching and research performance did not merit a higher salary increase.

**7.** *Mount Healthy City Sch. Dist. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), involved an alleged retaliatory refusal to renew a nontenured teacher's contract. The Court stated, "Even though [Doyle] could have been discharged for no reason whatever, . . . he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms." *Id.* at 283–84, 97 S.Ct. at 574. *See also Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

It should be noted that the retaliation doctrine does not depend on any objective expectations or claims of entitlement based on state law or contract and thus presents a different issue than that contained in a *procedural* due process claim. *See id.* at 597–98, 92 S.Ct. at 2697–2698.

We have some doubts whether Stone alleges more than a subjective "chill" of his constitutional rights; however, we assume *arguendo* that he has shown adequate "specific present objective harm" to survive the holding of *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–2326, 33 L.Ed.2d 154 (1972). *See also Finley v. Hampton,* 473 F.2d 180 (D.C. Cir. 1972).

Defendants argue, at least implicitly, for the fashioning of some sort of constitutional *de minimus* rule whereby all denials of pay raises, promotions, and other decisions that merely

affect an employee's *conditions* of employment would be nonactionable. However, since we need not decide this issue here, we prefer to paint with a narrower brush.

Some courts allow public employees to maintain actions based on claims that their employers altered the conditions of their employment in retaliation for their exercise of protected first amendment rights. *See McGill v. Board of Education,* 602 F.2d 774, 780 (7th Cir. 1979) (retaliatory transfers, as well as retaliatory discharges, are actionable); *Jervery v. Martin,* 336 F.Supp. 1350, 1354 (W.D.Va.1972) (retaliatory denial of salary increase actionable). Other courts apparently believe that retaliation that stops short of nonrenewal or discharge (that is, the *fact* of employment) is not actionable. *See Morey v. Independent Sch. Dist.,* 312 F.Supp. 1257, 1262 (D.Minn.1969), *aff'd,* 429 F.2d 428 (8th Cir. 1970) (denial of usual and customary scheduled salary increases). We find *Koscherak v. Schmeller,* 363 F.Supp. 932 (S.D.N.Y.) (three-judge court), *aff'd,* 415 U.S. 943, 94 S.Ct. 1462, 39 L.Ed.2d 560 (1973), inapposite, since plaintiffs there made no claim of retaliation in defendants' denial of promotions.

**8.** In an alternative allegation Stone challenges the pay raise classifications on equal protection grounds. Since this is a classification based on wealth, it passes constitutional scrutiny because it is substantially related to legitimate, even important, objectives of the university. *See San Antonio Ind. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1293, 36 L.Ed.2d 16 (1973).

530

Under the holding in *Mount Healthy City School District v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), defendants must establish that they "would have reached the same decision as to [Stone's salary] even in the absence of the protected conduct." We believe the evidence produced in support of the motion for summary judgment satisfies this burden. Were we to rule otherwise, we would place Stone in a better position as a result of his exercise of constitutionally protected conduct than he would have occupied had he done nothing. This *Mount Healthy* forbids us to do. *Id.* at 285, 97 S.Ct. at 575.

Since the summary judgment materials reveal no genuine issue of fact as to what Dean Cutlip and the other defendants would have done in the absence of Stone's disagreement with Cutlip, we affirm the trial court's decision.

AFFIRMED.