In the Matter of TOPGALLANT LINES, INC., Debtor.

McALLISTER TOWING, et al., Appellant and Cross–Appellee,

v.

AMBASSADOR FACTORS, DIVISION FLEET FACTORS CORPORATION, Appellee and Cross–Appellant.

ITEL CONTAINERS, Appellant and Cross–Appellee,

v.

AMBASSADOR FACTORS, DIVISION FLEET FACTORS CORPORATION, Appellee and Cross–Appellant.

CERES MARINE TERMINALS, et al., Appellant and Cross–Appellee,

v.

AMBASSADOR FACTORS, DIVISION FLEET FACTORS CORPORATION, Appellee and Cross–Appellant.

FIRST AMERICAN BULK CARRIER CORPORATION, et al., Appellant and Cross–Appellee,

v.

AMBASSADOR FACTORS, DIVISION FLEET FACTORS CORPORATION, Appellee and Cross–Appellant.

EUROPE COMBINE TERMINALS, et al., Appellant and Cross–Appellee,

v.

AMBASSADOR FACTORS, DIVISION FLEET FACTORS CORPORATION, Appellee and Cross–Appellant.

Nos. CV 492–053 to 492–056 and CV 492–092.

United States District Court, S.D. Georgia, Savannah Division.

April 27, 1993.

Gordon D. Schreck, Charleston, SC, George H. Chamlee, Savannah, GA, Robert S. Glenn, Jr., Savannah, GA, Kathleen Horne, Mark Bulovic, Savannah, GA.

John M. Tatum, Savannah, GA, Joseph Moscou, Mineola, NY.

### *ORDER AND MEMORANDUM*

NANGLE, District Judge.

Ambassador Factors, the appellee/cross-appellant, appeals the February 4, 1991, decision of the bankruptcy court[1] which granted appellants' Motion for Summary Judgment on the ground that valid maritime liens are superior to perfected Uniform Commercial Code (UCC) security interests in the same collateral. *See In the Matter of Topgallant Lines, Inc.,* 125 B.R. 682 (Bankr.S.D.Ga.1991) (hereinafter re-

---

**1.** The Honorable Lamar W. Davis, Jr., Chief Judge, United States Bankruptcy Court for the Southern District of Georgia.

ferred to as *"Topgallant I"*). First American Bulk Carrier Corporation and various maritime lien claimants, appellants/cross-appellees, appeal the February 5, 1992, decision of the bankruptcy court which granted the appellee's Motion for Summary Judgment on the ground that the appellants are not entitled to maritime lien status. *See In the Matter of Topgallant Lines, Inc.*, 138 B.R. 314 (Bankr.S.D.Ga. 1992) (hereinafter referred to as *"Topgallant II"*). The Court heard oral arguments in this matter on September 15, 1992, and has considered the parties' pleadings, letter briefs, exhibits, and record on appeal. For the reasons described below, the decisions of the bankruptcy court will be affirmed in part and remanded in part for specific findings.

## FACTS

First American Bulk Carrier Corporation (FABC) chartered the M/V CHESAPEAKE BAY and the M/V DELAWARE BAY from the Connecticut National Bank in accordance with two bareboat charter parties.[2] On or about April 21, 1987, Topgallant Group, Inc., predecessor in interest to the Debtor in this action, subchartered the vessels in accordance with two subbareboat charter parties from FABC. By separate addenda dated June 30, 1989, the two subbareboat charter parties were amended and assigned by Topgallant Group to the Debtor, Topgallant Lines, Inc.

On April 19, 1989, the Debtor and Ambassador Factors (Ambassador) entered into a security agreement covering accounts receivable, inventory, and equipment of the Debtor. On April 28, 1989, Ambassador recorded two Uniform Commercial Code (UCC) Financing Statements in the Office of the Clerk of Superior Court of Chatham County, Georgia, covering "[a]ll present and hereafter created and/or acquired accounts receivable, inventory,

machinery and equipment and general intangibles [of the debtor] ..." On August 30, 1989, Ambassador filed a similar UCC financing statement with the Secretary of State of New Jersey.[3]

On December 13, 1989, the Debtor filed its voluntary petition under Chapter 11 of the bankruptcy code in the United States Bankruptcy Court for the Southern District of Georgia. In its findings of fact in *Topgallant I*, the bankruptcy court found that there was some dispute as to whether FABC affirmatively terminated the charters on or before the filing date, or whether FABC and the Debtor had mutually agreed to operate under the terms of the charters after that date. Nonetheless, at the time that the Debtor filed its petition, the M/V CHESAPEAKE BAY was in Bremerhaven, West Germany, and the M/V DELAWARE BAY was en route to Europe from Charleston, South Carolina.

On December 18, 1989, the Association of Maryland Pilots and the Pilots Association for the Bay and River Delaware obtained an order for the seizure of the M/V DELAWARE BAY and the M/V CHESAPEAKE BAY in the municipal court in Bremerhaven, West Germany. In fall 1990, FABC furnished bank guarantees to secure the release of the two vessels from the attachment of nine creditors ("the German claimants"). The bank guarantees issued to the German claimants provided in pertinent part as follows:

In the seizure proceedings [case reference] ... the decision of 12/18/89 has ordered the seizure of the M/V CHESAPEAKE BAY in the harbor of Bremerhaven. According to this resolution, the respondent [FABC] is entitled to have the seizure lifted by depositing a total of DM 300,000.00 ... We hereby unconditionally, inevocably and absolutely and without time limit, stand security for the

---

2. Under a bareboat charter, "the charterer takes over the ship, lock, stock and barrel, and mans her with his own people. He becomes, in effect, the owner *pro hac vice* ..." Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty, § 4–1 at 194 (2d ed. 1975) (hereinafter referred to as "Gilmore & Black").

3. By Order dated July 16, 1991, the bankruptcy court held that Ambassador has a properly perfected UCC security interest under both Georgia and New Jersey law. The parties do not challenge this finding on appeal.

respondent ... as surety for all claims for which the seizure was ordered.

/s/ Deutsche Bank, A.G.,
in Hamburg

When the M/V CHESAPEAKE BAY and the M/V DELAWARE BAY departed from Bremerhaven in fall 1990, they resumed trading between Europe and the United States. At times when the vessels were scheduled to call at ports in the United States, maritime lien claimants threatened to commence proceedings *in rem* against the vessels. To avoid arrest of the vessels, FABC furnished sixteen parties ("the United States claimants") with letters of undertaking between September 25, 1990, and October 15, 1990. These letters of undertaking provided as follows:

> In consideration of the claimant refraining from arresting or attaching the above-named vessel or any other vessels or property of the registered owner ... with respect to claims *in rem* against the vessel arising from goods or services furnished by claimant pursuant to orders from Topgallant ... the undersigned company hereby agrees ...
>
> > (2) in the event a final decree ... be entered in favor of claimant against the vessel ... then the undersigned company agrees to pay and satisfy, up to but not exceeding $____.

/s/ St. Paul Fire and
Maritime Insurance Co.

Pursuant to an Order of the bankruptcy court, a fund of money is being held in an interest-bearing sequestered account. This fund includes all collections on the Debtor's accounts, all freight[4] monies for cargoes carried by the vessels, and all other monies received by the Debtor or Ambassador for the Debtor's account. All funds in the sequestered account are deemed to retain the character that they held prior to deposit; for example, any freight monies deposited in the account pursuant to that Order maintain their character as freights for

maritime lien purposes. The bankruptcy court found a dispute as to whether all the freights of the final voyage were earned by the Debtor.

FABC and other creditors have filed proofs of claim in the bankruptcy court asserting that their claims are, in whole or in part, secured by maritime liens on the Debtor's freights, including those freights held in the sequestered account. Ambassador disputes the lien status and priority of these claims, and alleges that its perfected UCC security interest takes priority over the interests of the maritime liens claimants.

**DISCUSSION**

This Court has jurisdiction of the appeal and cross-appeal pursuant to 28 U.S.C. § 158(a), and reviews the bankruptcy court's grant of summary judgment *de novo. In re Diamond Mfg. Co.,* 123 B.R. 125 (S.D.Ga.1990), *aff'd sub nom. Moore v. Diamond Mfg. Co.,* 959 F.2d 972 (11th Cir. 1992).

The parties raise the following issues on appeal:

I. Whether Ambassador's perfected Uniform Commercial Code security interest in a debtor's accounts, which include freights earned by a chartered ocean-going vessel, has priority over maritime liens for necessaries subsequently furnished to the vessel.

II. Whether valid maritime liens on freights are extinguished by the subsequent posting of security to release the vessels from *in rem* arrest or by the acceptance of security by maritime lien creditors to refrain from the *in rem* arrest of the vessels.

III. Whether valid maritime liens on freights are extinguished by the posting of bank guarantees to release the vessels from attachment in an *in personam* action.

IV. Whether FABC, pursuant to 11 U.S.C. § 509, may be subrogated to the rights of maritime lien claimants whose claims it satisfied.

---

**4.** "Freight" earned by cargo represents, exclusive of commissions, the sum to be paid for use of a ship. *N.H. Shipping Corp. v. Freights of the*

*S.S. JACKIE HAUSE,* 181 F.Supp. 165 (S.D.N.Y. 1960).

V. Whether the freights of the last voyage of the M/V DELAWARE BAY are subject to Ambassador's security interest.

VI. Whether freights remain subject to maritime liens even though paid to Ambassador or an agent of the debtor.

VII. Whether the single voyage rule affects only the priority of maritime liens on freights.

Each claim will be addressed in turn.

## I. MARITIME LIENS HAVE PRIORITY OVER UCC SECURITY INTERESTS.

Ambassador contests the bankruptcy court's holding that "... valid maritime liens as hereafter allowed will be afforded priority over perfected UCC security interests ..." *Topgallant I*, 125 B.R. at 687. In reaching this conclusion, the bankruptcy court first held that the Federal Maritime Lien Act, 46 U.S.C. § 31301 *et seq.*, does not specifically supersede the UCC. *Id.* at 685. The priority provisions of the UCC, however, have no effect on the maritime liens created under the Act since O.C.G.A. § 11–9–104(a) [5] makes the UCC inapplicable to a security interest subject to any statute of the United States. *Id.* at 686. Alternatively, the bankruptcy court found that the UCC applies only to consensual transactions, while "the claim of maritime lien holders, by definition, is not consensual." *Id.*

Ambassador contends that the creation and validity of maritime liens are excluded from the UCC, but that priority issues involving maritime liens are governed by the UCC.

### A. *Freights and subfreights fall within the literal terms of the UCC, but their inclusion therein does not give Ambassador priority over valid maritime liens.*

■ Ambassador advances that there can be "little doubt" that Article Nine en-

compasses security interests in freight and subfreight. O.C.G.A. § 11–9–106 provides that "[a]ll right to payment earned or unearned under a charter or other contract involving the use or hire of a vessel and all rights incident to the charter or contract are accounts." Since freights arise from the performance of services under a contract of affreightment and charter hire includes freights arising from performance of a charter, freights and subfreights fall within the definition of accounts contained in § 11–9–106. *See generally* Robert Leon Poster, *The Uniform Commercial Code and Bankruptcy*, 59 Tul.L.Rev. 1361 (1985). Although Ambassador can hold a security interest in the freights and subfreights of the M/V DELAWARE BAY and the M/V CHESAPEAKE BAY, UCC priority rules do not apply to valid maritime liens due to O.C.G.A. § 11–9–104(a).

### 1. O.C.G.A. § 11–9–104(a) renders Article Nine inapplicable to security interests subject to federal statutes.

■ Under Georgia's version of the UCC, Article Nine does not apply to "a security interest subject to any statute of the United States to the extent that such statute governs the rights of parties to and third parties affected by transactions in particular types of property." O.C.G.A. § 11–9–104(a) (1982). The Official Comment to § 9–104 reads as follows:

Where a federal statute regulates the incidents of security interests in particular types of property, those security interests are of course governed by the federal statute and excluded from this Article. The Ship Mortgage Act, 1920,[6] is an example of such a federal act.

... Even such a statute as the Ship Mortgage Act is far from a comprehensive regulation of all aspects of ship mortgage financing. That Act contains

---

**5.** Georgia's version of the UCC is codified in Title 11 of the Official Code of Georgia Annotated.

**6.** The Ship Mortgage Act, 46 U.S.C.App. §§ 911 *et seq.*, was repealed by Title I of Pub.L. 100–710

effective January 1, 1989. Federal law concerning ship mortgages is found in 46 U.S.C. §§ 31301 *et seq.*; federal law on maritime liens is codified within the same chapter.

provisions on formal requisites, on recordation and on foreclosure but not much more. If problems arise under a ship mortgage which are not covered by the Act, the federal admiralty court must decide whether to improvise an answer under "federal law" or to follow the law of some state with which the mortgage transaction has appropriate contacts. The exclusionary language in paragraph (a) is that this Article does not apply to such security interest "to the extent" that the federal statute governs the rights of the parties. Thus if the federal statute contained no relevant provision, this Article *could* be looked to for an answer.

Uniform Commercial Code § 9–104 cmt. 1 (1972) (emphasis added).

The Maritime Lien Act is, in fact, far from a comprehensive regulation of all aspects of maritime liens. *See* 46 U.S.C. §§ 31305, 31326, 31341, 31342, 31343. However, the courts and commentators who have addressed this issue have chosen "to improvise an answer under 'federal law'" rather than follow the UCC. For example, one court noted the following:

> [I]t is most unlikely that the drafters of the UCC intended to create a single filing statute that would apply in an identical matter to both personal property financing and maritime liens. It is even more unlikely that the drafters would have neglected an intention to entirely rewrite the long-standing filing and priority rules of maritime law.

*Matter of Pacific Caribbean Shipping (U.S.A.)*, 789 F.2d 1406, 1407 (9th Cir.1986) (noting that inclusion of ship charters in § 9–106 may be quite properly read as referring to situations where ship charters are used as collateral in land-based transactions), *citing* Gilmore & Black, 586–589 (2d. ed. 1975). *See also Kopac Int'l, Inc. v. M/V BOLD VENTURE*, 1987 A.M.C. 192, 1986 WL 15496 (W.D.Wash.1986) (general maritime law preempts the UCC); *United States v. ZP Chandon*, 889 F.2d 233 (9th Cir.1989) (whether seaman had lien priority over other creditors in bankruptcy depends on admiralty and maritime law, not the law that governs transactions occurring on

land); *Midlantic Nat'l Bank v. Sheldon*, 751 F.Supp. 26 (E.D.N.Y.1990) (in dispute between priority of preferred ship mortgage and maritime lien, "it is clear that this Court's admiralty jurisdiction and the provisions of 46 U.S.C. §§ 31301 *et seq.* preempt the New York [UCC]"); *In re Sterling Navigation Co., Ltd.*, 31 B.R. 619 (S.D.N.Y.1983) (shipowner's maritime lien on subfreight not subject to Article Nine).

Accordingly, § 11–9–104(a) renders the maritime liens of the claimants outside the ambit of Article Nine. Unlike § 11–9–104(b), its state lien law counterpart, § 11–9–104(a) does not specifically subject federal liens to the UCC's priority rules.

**2. Georgia courts have not announced a blanket rule that transactions excluded from Article Nine are subject to its priority rules in the event of a conflict.**

■ Ambassador next asserts that "[e]ven transactions that are excluded from Article Nine by O.C.G.A. Section 11–9–104 are subject to the Code priority rules when they conflict with a Code security interest." Br. of Appellee, p. 26. In support of its argument, Ambassador relies on *Continental Am. Life Ins. Co. v. Griffin*, 251 Ga. 412, 306 S.E.2d 285 (1983), which analyzed O.C.G.A. § 11–9–104(g), the provision of the Georgia UCC making Article Nine inapplicable to the right of set-off.

*Continental* concerned claims between a secured creditor and the holder of a right of set-off entered into as part of an employment contract. The Court explained that § 9–104(g) was originally drafted to appease the banking industry, which was afraid that its right of set-off against a debtor's account (often called a "banker's lien") would be subject to Article Nine's requirements to create a security interest. *Id.* 306 S.E.2d at 287. However, "given the *narrow purpose* of the set-off exclusion," the Court refused to read § 11–9–104(g) as removing priority disputes over the right of set-off from the UCC. *Id.* (emphasis added).

Nothing indicates that § 11–9–104(a) was drafted to serve a similarly narrow purpose

so as to exclude creation of federal security interests from the UCC but subject them to the priority rules of the UCC. Ambassador relies on the broad language employed by the *Continental* court in dicta: "The effect of [§ 11–9–201][7] is to give the Article Nine secured party, upon a debtor's default, priority over 'anyone, anywhere, anyhow,' except as otherwise provided by the remaining Code priority rules." *Continental*, 306 S.E.2d at 287. Unlike the apparent lack of non-UCC priority rules applicable to set-off, maritime liens have an established system of priority completely distinct from the priority imposed by the UCC. *See generally,* Gilmore & Black, 586–589 (2d ed. 1975) ("Maritime liens generally have priority in *reverse* chronological order, while Article Nine security interests generally have priority in normal chronological order.").

Thus, *Continental* is inapposite to the case at bar. This Court is unwilling to ignore both the exemption of federally created security interests in § 11–9–104(a) and the differences in priority rules contained in the UCC and maritime law.

### B. *The UCC applies only to consensual transactions, and maritime liens, by definition, are not consensual.*

■ In addition to § 9–11–104(a)'s exclusion of federally created liens, Article Nine's scope is further limited to transactions "which [are] *intended* to create a security interest." O.C.G.A. § 11–9–102(1)(a). Maritime liens do not fall within this scope.

■ The Maritime Lien Act automatically gives rise to a maritime lien when a person furnishes necessaries to a vessel, and neither intent nor consent is involved in its formation. 46 U.S.C. § 31342(a)(1). *See also* Gilmore & Black, 586–589 (2d ed. 1975) ("... [M]aritime liens have extraordinarily little in common with land liens, including consensual security interests."). Since maritime liens do not fall within Article Nine's scope, the priority provisions of the UCC are inapplicable.

Both § 11–9–104(a) and § 11–9–102(1)(a) exclude maritime liens from Georgia's version of Article Nine by exempting federally created interests and non-consensual transactions. Applying Article Nine's priority rules to maritime liens is not warranted in light of these clear exclusions and the differences in priority determinations under the UCC and maritime law.

### C. *Maritime lienors have priority over holders of UCC security interests.*

■ Having determined that the priority provisions of the UCC do not apply to maritime liens, this Court must decide whether valid maritime liens have priority over a perfected UCC security interest. Case law, whether pre- or post-UCC, compels an affirmative response.

■ "Any priority given by the statute of a state, or by decisions at common law or in equity, is immaterial ... the admiralty court of the United States, enforcing the lien because it is maritime in nature ... must give it the rank to which it is entitled by the principles of maritime and admiralty law." *The J.E. RUMBELL*, 148 U.S. 1, 19, 13 S.Ct. 498, 503, 37 L.Ed. 345 (1893). Maritime liens prevail over non-maritime claims. *Taiwan Int'l Line, Ltd. v. Matthew Ship Chartering Ltd.*, 546 F.Supp. 826 (S.D.N.Y.1982). Although few cases have dealt specifically with clashes between the UCC and maritime law, those decisions that have addressed the issue resolve any conflict in favor of maritime law. *See, e.g., Pacific Caribbean*, 789 F.2d at 1408 (maritime lienor not required to perfect interest under Article Nine to prevail over bankruptcy trustee); *Matthews v. Richmond*, 11 Wash.App. 703, 525 P.2d 810 (1974) (plaintiff's perfection of a security interest in the vessel did not establish his priority over a subsequent maritime lienor). Thus, Ambassador's perfected UCC security interest is subordinate to valid maritime liens on the M/V DELAWARE BAY and the M/V CHESAPEAKE BAY.

---

**7.** O.C.G.A. § 11–9–201 concerns the general validity of security agreements; it is not one of the specific priority statutes.

## II. MARITIME LIENS ARE EXTINGUISHED BY THE POSTING AND/OR ACCEPTANCE OF ALTERNATIVE SECURITY IN *IN REM* ACTIONS.

Without distinguishing between the rights of the United States claimants and the German claimants, the bankruptcy court held that since a lien on freights is derivative of a lien on the vessel, it cannot survive a lienholder's agreement to release its lien on the vessel. *Topgallant II*, 138 B.R. at 320. The United States claimants make several arguments for reversing the bankruptcy court's decision on this ground. However, none of the claimants' arguments convinces this Court that the bankruptcy court's decision was in error.

### A. *Acceptance of the letters of undertaking released the claimants' maritime liens in the vessels.*

■■■ A traditional letter of undertaking allows the vessel owner to post security on the vessel in exchange for the vessel not being seized by creditors and released on bond. *Panaconti Shipping Co., S.A. v. M/V YPAPANTI*, 865 F.2d 705 (5th Cir. 1989). *See generally* Gilmore & Black, 800–801 (2d ed. 1975). The owner generally agrees to enter an appearance, acknowledge ownership, and whether the vessel be lost or not, pay any final decree entered against the ship. *Salazar v. THE ATLANTIC SUN*, 881 F.2d 73, 77 (3d Cir.1989). To avoid needless cost, time, and inconvenience, this informal agreement is usually treated as having the same legal effect as a formal release under a bond or stipulation. *Continental Grain Co. v. Federal Barge Lines*, 268 F.2d 240 (5th Cir.1959), *aff'd*, 364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960).

■■■ Where a bond or stipulation has been given, the lien is transferred from the ship to the fund represented by the bond or stipulation. Gilmore & Black, 799 (2d ed. 1975). *See also Alyeska Pipeline Serv. Co. v. The Vessel BAY RIDGE*, 703 F.2d 381 (9th Cir.1983) (release of a vessel upon posting of security discharges the lien against the vessel, and the alternative security is substituted for the vessel as the *res*). The same result occurs when an owner furnishes a letter of undertaking: "[T]he release of a seized vessel upon the posting of alternative security forever discharges the lien against the vessel and the lien is transferred to the new security, whether it be a bond or letter of undertaking." *Globe Barge, Inc. v. Johness Hunter, Inc.*, 1986 A.M.C. 1989, 1993 (E.D.La.1986) (no lien on vessel where lienors accepted letters of undertaking from time charterers).

One court has thoroughly analyzed the effect of the acceptance of security on the existence of maritime liens. In *Southern Oregon Prod. Credit Ass'n v. The Oil Screw SWEET PEA*, 435 F.Supp. 454 (D.Oregon 1977), Port Welding & Machine Works, Inc., performed certain repairs on the SWEET PEA, resulting in the formation of a maritime lien. After receiving no compensation, Port Welding filed an *in rem* action against the vessel and an *in personam* action against her owner. The SWEET PEA was seized under a Warrant of Arrest; subsequently, the parties agreed by stipulation to release the SWEET PEA on the condition that $5,000.00 be paid to the Court and the owner turn over all documentation of ownership. A stipulated judgment for $29,000.00 was rendered, and Port Welding received $4,000.00 from the security deposited with the court.

Port Welding sought to recover the remaining $25,000.00 after the SWEET PEA was sold, but the Court limited Port Welding's recovery to the security deposited with the Court. *Id.* at 458–459. It noted that the release transferred the lien from the vessel to the fund represented by the stipulation by operation of law. *Id.* at 458–459, *citing* Gilmore & Black, 798–800 (2d ed. 1975). The Court also refused to relieve Port Wenthworth from a deal of its own making once the adverse consequences became apparent. *SWEET PEA*, 435 F.Supp. at 459.

■■■ By accepting the letters of undertaking, the United States claimants agreed to look to the alternative security posted by those documents rather the vessels or their freights. As noted by Ambassador at oral

argument, the claimants who have accepted letters of undertaking are in a safer position than maritime lien claimants since the former are assured of payment. Even if the payments under the letters of undertaking are ultimately less than the amount awarded to maritime lien claimants in these bankruptcy proceedings, the United States claimants "cannot repudiate [their] consent to the release merely because the adverse consequence have now become apparent." *Id.*

### B. *Freights are considered incident to the vessel.*

 When the United States claimants accepted the letters of undertaking, the liens on the vessels were transferred to the fund represented by the alternative security, not the freights. Without a lien on the vessel, the claimants cannot have a lien on her freights. *United States v. Robins Dry Dock & Repair Co.*, 13 F.2d 808, 814 (1st Cir.1926) (Court explicitly rejected argument that freights are distinct from the ship; review of applicable cases indicated that "freight is the hire of the ship and incident to the ship."). *See also Gulf Oil Trading Co. v. Creole Supply*, 596 F.2d 515 (2d Cir.1979); *Morgan Guaranty Trust Co. v. Hellenic Lines, Ltd.*, 38 B.R. 987, 992 (S.D.N.Y.1984) (fact that prior order did not specifically cover freights was of no consequence; freights covered "by operation of law because a vessel and her freights are one"); *Ocean Cargo Lines, Ltd. v. North Atl. Marine Co.*, 227 F.Supp. 872 (S.D.N.Y.1964) (prohibition of lien clause forbidding liens against vessel also forbids liens against freights).

 When the United States claimants relinquished their maritime liens on the M/V CHESAPEAKE BAY and the M/V DELAWARE BAY by accepting the letters of undertaking, they also relinquished all maritime liens on the freights of these vessels. Accordingly, these claimants must look to the security represented by the

letters of undertaking for satisfaction of their claims.

### C. *The claimants' reliance on Hellenic Lines for the proposition that maritime liens on freights survive judicial sale of a vessel is misplaced.*

Appellants next argue that courts have upheld maritime liens on freights after judicial sale of the vessel. They rely heavily on *Morgan Guaranty Trust Co. v. Hellenic Lines Ltd.*, 585 F.Supp. 1227 (S.D.N.Y. 1984) (J. Sweet), for support of this proposition. In *Hellenic Lines*, the Court ordered Hellenic to pay into the registry of the court all freights earned on certain voyages of vessels [8] for distribution among maritime lien claimants. *Id.* at 1230. Although not in the *Hellenic Lines* opinion, appellants submitted the following material to the bankruptcy court in the case at bar:

[O]n April 19, 1984 (27 days prior to the order of Judge Sweet covering the freights of the HELLENIC EXPLORER), the High Court of Singapore ordered the vessel to be sold in an action *in rem;* the sale was held on July 19, 1984. The HELLENIC PRIDE was also sold in an admiralty foreclosure sale in Greece on September 25, 1984, and the HELLENIC VALOR was foreclosed in Greece on September 25, 1985. The vessels were sold by foreign courts free and clear of maritime liens ...

Br. of Appellants, pp. 25–26.

Appellants also noted the distribution of freights by the Special Master in *Hellenic Lines*, and claim that "the Special Master and four admiralty firms ... were engaged in unnecessary litigation if the conclusions of the bankruptcy court were correct (that a 'vessel and her freights are one' and 'the release of the vessel must necessarily release all lien rights to the freights'), since the foreign foreclosure sales of the vessels would have extinguished all maritime liens on their freights." Br. of Appellants, p. 25.

 The appellants ignore a crucial factor in their argument: a prior order by

---

**8.** These vessels were the M/V HELLENIC EXPLORER, M/V HELLENIC GRACE, M/V HELLENIC CHAMPION, M/V HELLENIC CHALLENGER, M/V HELLENIC VALOR and M/V HELLENIC PRIDE.

Judge Sweet in *Morgan Guaranty Trust Co. v. Hellenic Lines Ltd.*, 38 B.R. 987 (S.D.N.Y.1984). Maritime lien claimants obtained Warrants for Arrest *In Rem* against the M/V HELLENIC STAR, M/V HELLENIC INNOVATOR, M/V HELLENIC IDEAL, and M/V HELLENIC SPIRIT. One claimant, ITO, obtained Warrants for Arrest *In Rem* against the freights, sub-freights, and charter-hire of certain vessels;[9] the underlying vessels—including the M/V HELLENIC EXPLORER, the M/V HELLENIC PRIDE, and the M/V HELLENIC VALOR—were not arrested in the jurisdiction. The issue of which court, bankruptcy or admiralty, had jurisdiction over ITO's pending *in rem* action against the freights, was resolved in favor of the bankruptcy court. *Id.* at 992.

**1. The freights which had been seized without arrest of the underlying vessel were properly part of the bankruptcy estate.**

The Court first found that the freights arrested by ITO were properly within the jurisdiction of the bankruptcy court as part of the legal or equitable interest of the debtor in property under 11 U.S.C. § 541(a)(1). *Id.* at 993. It then noted that bankruptcy courts have the power to adjudicate maritime liens. *Id.* at 995. As opposed to the vessels, which are "peculiarly maritime in nature," the freights seized by ITO were "essentially accounts receivable." *Id.* at 999. As a result, the freights earned by vessels *other than* the INNOVATOR, IDEAL, STAR and SPIRIT were part of the reorganization estate, which includes property of the debtor seized by a creditor prior to the filing of a reorganization petition. *Id.* at 999, *citing United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Since the bankruptcy estate of the debtor in *Hellenic Lines* included the freights seized by ITO, the bankruptcy court could properly dis-pose of these freights despite the sale in Singapore of the underlying vessels.[10]

**2. Where the underlying vessel has been arrested in the jurisdiction, a vessel and her freights are one.**

With regard to the INNOVATOR, IDEAL, STAR, and SPIRIT—vessels which were arrested in the jurisdiction by maritime lienors—Judge Sweet's earlier opinion expressly stated that "freights are considered incident to the vessel." *Hellenic Lines*, 38 B.R. at 991–992. Despite the fact that a prior order by the bankruptcy court did not explicitly cover the freights, freights were included by operation of law since "a vessel and her freights are one." *Id.*

The two *Hellenic Lines* decisions stand for the proposition that freights seized without arrest of the underlying vessel in the jurisdiction are properly part of the bankruptcy estate as the equivalent of accounts receivable. However, with regard to vessels seized and sold in the jurisdiction, maritime liens against these freights are extinguished since a vessel and her freights are one. Consideration of both opinions indicates that the M/V CHESAPEAKE BAY and the M/V DELAWARE BAY are inseparable from their freights since the United States claimants threatened arrest of the vessels.

**III. VALID MARITIME LIENS ARE TRANSFERRED BY THE ACCEPTANCE OF BANK GUARANTEES IN *IN PERSONAM* ACTIONS.**

Appellants next argue that the German claimants are entitled to assert their maritime lien claims against the freights even if the release of a vessel by the posting of security in an *in rem* action were held to extinguish maritime liens on her freights. According to appellants, this result accrues because the bank guarantees posted in the

---

**9.** Subfreights alone may constitute a res that furnishes sufficient basis for the exercise of *in rem* admiralty jurisdiction. *See United States v. Freights of the S.S. MOUNT SHASTA*, 274 U.S. 466, 47 S.Ct. 666, 71 L.Ed. 1156 (1927). Unlike ITO's arrest of the freights in *Hellenic Lines*, the United States claimants in the case at bar arrested the vessels.

**10.** The Court further stated that "no competing admiralty concern—i.e. sale of a vessel free and clear of all liens—[ ] would counsel a different result." *Id.* at 999.

proceedings in Germany were not posted in actions *in rem* against the vessels. Ambassador counters that this characterization is inconsequential since the bank guarantees effectively preclude the holders from rearresting the vessel.

### A. The Puchta affidavit indicates that Germany does not recognize in rem actions against vessels.

 A Court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. Fed. R.Civ.P. 44.1; *see also Trinidad Foundry and Fabricating, Ltd. v. M/V K.A.S. CAMILLA*, 966 F.2d 613 (11th Cir.1992) (affidavit of British solicitor relied upon to determine maritime law of England). To explain German maritime law on this issue, appellants have submitted the affidavit of Dr. Karl F. Puchta, an attorney in Hamburg, Germany, who predominantly practices admiralty law. Dr. Puchta stated as follows:

> The furnishing of security to the Claimants ... served only to release from attachment the Vessels in their status as personal property of the registered owner/chartered owner in connection with personal actions brought against the registered owner/ chartered owner as defendants. The German actions were not brought against the Vessels as defendants. [I] understand[ ] that *in rem* actions may be brought in the United States against the Vessels as defendant. Such procedure is not provided for under German law.

Aff. of Dr. Karl F. Puchta, 2–8–91, Record on Appeal document 38.

### B. Acceptance of alternative security in in personam actions transfers creditors' claims.

 In an *in rem* action, the vessel itself can be held liable for a debt that creates a maritime lien. *Perez & Compania (Cataluna), S.A. v. M/V MEXICO I*, 826 F.2d 1449 (5th Cir.1987). The owner bears no personal liability in the event that proceeds from the sale of a vessel are inadequate to satisfy creditors' claims. *Id.* at 1451. Conversely, in an *in personam* action, the object is a personal judgment for the full sum due. *Id.* The owner remains liable for the balance of the debt if the proceeds from the sale of a vessel do not satisfy the judgment. *Id.*

 Despite the undeniable differences between *in rem* and *in personam* proceedings, in both actions a seized vessel may be released and other security substituted. *Belcher Co. of Alabama, Inc. v. M/V MARATHA MARINER*, 724 F.2d 1161 (5th Cir.1984).[11] When an owner provides security to release the vessel from attachment, "the release does transfer the lien [sought to be enforced] from the vessel to the fund represented by the bond or letter of undertaking." *Id.* at 1165. Although the lien is transferred to the fund represented by the alternative security, the lien is not discharged. *Id.*

 By accepting the bank guarantees furnished by FABC, the German claimants agreed to transfer the liens that they sought to be enforced from the vessel to the security represented by the guarantees. Deutsche Bank, the issuer of the guarantees, agreed to "unconditionally, inevocably and absolutely and without time limit, stand security for [FABC] ... as surety for all claims for which the seizure was ordered." Accordingly, the German claimants must look to the bank guarantees, rather than the freights, for satisfaction of their claims.

### IV. FABC HAS NO RIGHT TO BE SUBROGATED TO THE RIGHTS OF MARITIME LIEN CLAIMANTS.

FABC claims that the bankruptcy court erred in holding that it was not entitled to

---

**11.** Belcher supplied fuel to a ship owned by Chowgule. Belcher had the vessel attached in the Netherlands to satisfy a debt; to secure the release of the vessel, Chowgule posted a letter of undertaking as security for its claim. Three years later, the same vessel was arrested in the United States, and an *in rem* action was initiated. The Court held that the different issues in the two actions necessitated a finding that the pending *in personam* action in the Netherlands did not preclude an *in rem* action in the United States, and noted that the same undertaking stood as security in both actions. *Id.* at 1166.

be subrogated to the rights of maritime lien claimants whose claims it satisfied. Although the bankruptcy court admitted that 11 U.S.C. § 509 appeared to support FABC's contentions, it held that FABC derived no lien rights upon the furnishing of security or payment of the lien claims. Since acceptance of alternative security discharged the maritime liens held by the claimants, FABC could not acquire by subrogation what the claimants discharged and released. Alternatively, the bankruptcy court found that FABC, as disponet owner, could not hold a maritime lien in its own vessel. *Topgallant II,* 138 B.R. at 323. The bankruptcy court's holding will be affirmed.

**A.** *By accepting alternative security, the creditors released their rights to assert maritime liens; without maritime liens, FABC cannot be subrogated to the creditors' rights.*

Subrogation permits one who pays the another's debt to stand in the shoes of the latter party and assert whatever rights that party held. *In re Denby Stores, Inc.,* 86 B.R. 768, 775 (Bankr. S.D.N.Y.1988). *See also Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). The party paying the debt may exercise all rights and remedies which the creditor possessed against the party who should have paid the debt. *In re Russell,* 101 B.R. 62 (Bankr.W.D.Ark. 1989). Under the bankruptcy code, "... an entity that is liable with the debtor on,[12] or that has secured,[13] a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment." 11 U.S.C. § 509(a). A key inquiry in the case at bar is the parameters of the creditors' rights.

FABC claims that the maritime liens existed as of the date of the debtor's bankruptcy filing, and the date of the bankruptcy filing is determinative of a creditor's rights. The three cases relied upon by FABC are inapposite.

First, in *Isaacs v. Hobbs Tire & Timber Co.,* 282 U.S. 734, 51 S.Ct. 270, 75 L.Ed. 645 (1930), a Texas federal court's ability to manage the bankruptcy estate was at issue; a statement concerning the preservation of valid liens in existence at the time of filing merely recognized that the Texas court would have to honor an Arkansas claimant. Second, in *In re Pernie Bailey Drilling Co.,* 131 B.R. 53 (Bankr.W.D.La. 1991), a perfected security interest subsequently became unperfected due to failure to file a reinscription. However, the security interest itself continued to exist, and the purpose of the filing requirement (adequate notice) had been served. *Id.* at 58. Third, in *Lockhart v. Garden City Bank & Trust Co.,* 116 F.2d 658 (2d Cir.1940), the lien itself did not cease to exist; the mortgagees merely failed to comply with state law.

Although these cases hold that lien rights are preserved even if a lien subsequently becomes unperfected, they differ greatly from the current matter: None involves the discharge or transfer of a lien to alternative security. Rather, the cases relied upon by FABC concern situations where the lien existed in the underlying property, subsequently became unperfected, but was never extinguished or transferred. In the case at bar, the claimants had valid maritime liens when the debtor filed for bankruptcy, but subsequently discharged or transferred these liens by accepting alternative security. Since "one cannot acquire by subrogation what another whose rights he claims did not have," *United States v. Munsey Trust Co.,* 332

---

**12.** "Liable with" means that "the parties are liable to the same creditor at the same time on the same debt." *In re Slamans,* 148 B.R. 623, 625 (Bankr.N.D.Okl.1992).

**13.** "Secured" refers to the granting of a security interest in an asset. *In re Valley Vue Joint Venture,* 123 B.R. 199 (Bankr.E.D.Va.1991). *See also* 3 Collier on Bankruptcy, ¶ 509.02 at 509–4

(15th ed. 1988) ("[T]he subrogation provision of Section 509(a) applies when an entity has secured a creditor of the debtor by using his own property as collateral without incurring any personal obligation.") FABC asserts that it secured the claims of the maritime lienors by the vessels or by the alternative security posted to ensure the vessels' release.

U.S. 234, 242, 67 S.Ct. 1599, 1603, 91 L.Ed. 2022 (1947), FABC cannot acquire by subrogation maritime liens on the vessels that were released or transferred when the claimants accepted alternative security.

**B.** ***While rights under § 509 subrogation and equitable subrogation differ, § 509 does not completely ignore all non-bankruptcy law.***

 FABC also argues that rights under 11 U.S.C. § 509 and equitable subrogation[14] are distinct. Accordingly, even if non-bankruptcy law (i.e., maritime law) would not allow subrogation in this instance, FABC asserts that § 509 would permit it to be subrogated to the maritime lien claimants. It relies on *In re Mulberry Chesterton Inn, L.P.*, 1992 WL 489775, No. 91–4020, slip. op. (Bankr.S.D.Ga. April 1, 1992), for the proposition that subrogation under § 509 may occur even if subrogation was impossible under non-bankruptcy subrogation principles. FABC concludes that "[i]t follows that FABC has a separate right under Section 509 even if, which is not the case, it could not have a lien on freights under maritime law." Br. of Appellants, p. 40.

 The Court agrees that § 509 creates a statutory right of subrogation independent of principles of equitable subrogation. *See In re Spirtos*, 103 B.R. 240, 245 (Bankr.C.D.Cal.1989) ("... equitable subrogation is separate and distinct from the subrogation rights afforded by section 509 ..."). However, FABC's distinction between bankruptcy law and non-bankruptcy law is too broad. Cases discussing § 509 and equitable subrogation distinguish the two claims in that the latter involves state subrogation law. *See Mulberry Chesterton Inn, L.P.*, No. 91–4020, slip. op. at 24 ("Subrogation for partial payment under Section 509 is a deviation

from the equitable doctrine of subrogation ... which required full payment of the debt."). There is no blanket proposition that all non-bankruptcy law is encompassed in equitable subrogation, or that subrogation under § 509 completely ignores non-bankruptcy law. *See In re Bugos*, 760 F.2d 731, 734 (7th Cir.1985), *citing* D. Cowans, Bankruptcy Law and Practice § 12.29 (1983 Interim Ed.) (discussing subrogation in bankruptcy, court stated that "[b]ankruptcy law does not create such liabilities nor does it create the right of such person to reimbursement from the debtor. They are a matter of non-bankruptcy law.").

 Since § 509 does not exist in a vacuum, the Court agrees with the bankruptcy court's alternative holding. Under maritime law, FABC, as disponet owner of the M/V CHESAPEAKE BAY and the M/V DELAWARE BAY, cannot hold maritime liens in its own vessels. *Sasportes v. M/V SOL DE COPACABANA*, 581 F.2d 1204, 1209 (5th Cir.1978) ("when the seas get rough one who looks, thinks, acts, and profits like an owner cannot retreat to the relatively safe harbor of a maritime lienor."). *See also Tramp Oil & Marine Ltd. v. M/V MERMAID I*, 630 F.Supp. 630 (D.P.R.), *aff'd* 805 F.2d 42 (1st Cir.1986). Since FABC cannot hold maritime liens in the M/V CHESAPEAKE BAY and the M/V DELAWARE BAY, it cannot stand in the shoes of the maritime lien claimants. If allowed to do so, FABC would acquire by subrogation something that maritime law prohibits.[15]

As a result, FABC is not subrogated to the rights of maritime lien claimants pursuant to 11 U.S.C. § 509. Acceptance of the alternative security by the claimants discharged the liens on the vessels and transferred the liens to the funds represented by

---

**14.** FABC has not asserted a colorable argument entitling it to prevail on an equitable subrogation analysis. Equitable subrogation requires satisfaction of the following five-part test: 1) the codebtor must have made payment to protect its own interests; 2) the codebtor must not have been a volunteer; 3) the payment must satisfy a debt for which the codebtor was not primarily liable; 4) the entire debt must have been paid; and 5) subrogation would not cause injustice to

the rights of others. *In re Kaiser Steel Corp.*, 89 B.R. 150 (Bankr.D.Colo.1988).

**15.** The charter party between Connecticut National Bank and FABC also prohibits FABC from obtaining a maritime lien on the vessels: FABC agreed that it would have no "right, power or authority to create, incur or permit ... any lien whatsoever ... upon the Vessel[s] ..."

the letters of undertaking and bank guarantees. Since the claimants relinquished their rights to maritime liens on the vessels, FABC cannot acquire maritime liens on the vessels by subrogation. Alternatively, FABC cannot acquire maritime liens on its own vessels by virtue of its disponet owner status. Under either view, FABC has acquired no subrogation rights.

## V. THE REMAINING CLAIMS MUST BE REMANDED TO THE BANKRUPTCY COURT.

The bankruptcy court made no findings on issues V, VI, and VII although Ambassador raised the claims on summary judgment. *See Topgallant I*, 125 B.R. at 684. "While Federal Rule of Civil Procedure 52(a) states that '[f]indings of fact and conclusions of law are unnecessary on decisions of motions' under Rule 56, ... if a reviewing court cannot tell from the order and from the record the grounds on which summary judgment was granted, effective review may be impossible." *Stone v. Board of Regents of Univ. Sys. of Georgia*, 620 F.2d 526, 528 (5th Cir.1980).[16] Since this Court cannot determine on what grounds summary judgment was granted as to the remaining issues, these matters addressed in issues V, VI, and VII should be remanded to the bankruptcy court for specific findings.

## CONCLUSION

Ambassador, holder of a properly perfected UCC security interest in the Debtor's freights, does not take priority over holders of valid maritime liens. While freights fall within the literal terms of O.C.G.A. § 11-9-106, their inclusion therein does not subject maritime lien claimants to UCC priority rules. First, O.C.G.A. § 11-9-104(a) excludes security interests arising under federal statutes from the ambit of the UCC; unlike § 11-9-104(b), its state law counterpart, § 11-9-104(a) does not specifically subject federal liens to UCC priority provisions. Second, § 11-9-102 excludes non-consensual transactions from the UCC. Maritime liens by nature arise

without intent or consent. Finally, maritime liens take priority over UCC security interests under pre- or post-UCC cases.

By accepting letters of undertaking from FABC, the United States claimants released their maritime liens on the M/V CHESAPEAKE BAY and the M/V DELAWARE BAY. This result accrues because letters of undertaking stand as alternative security for the vessel. The lien is transferred from the vessel to the fund represented by the alternative security, not to the freights since freights are merely incident to the vessel. Thus, discharging the lien on the vessel discharges the lien on her freights.

Although Germany does not recognize *in rem* claims, in either *in personam* or *in rem* claims, a seized vessel may be released and other security substituted. By accepting the bank guarantees, the German claimants agreed to transfer their maritime liens from the vessels to the fund represented by the alternative security. With regard to the United States and German claimants, the Court has not "sacrificed maritime lienors" as contended by FABC; these claimants are assured payment from the funds represented by the alternative security without having to endure the uncertainty of a bankruptcy proceeding.

Since acceptance of the letters of undertaking and bank guarantees released or transferred maritime liens on the vessels to the alternative security, FABC cannot stand in the claimants' shoes under 11 U.S.C. § 509. This case does not involve a security interest that becomes unperfected after a bankruptcy filing. Despite the fact that the maritime liens existed at the date of the Debtor's bankruptcy filing, the claimants subsequently released their rights to proceed against the vessels. Additionally, § 509 does not ignore all nonbankruptcy law, making it inappropriate for a disponet owner like FABC to hold maritime liens in its own vessels.

Finally, in granting summary judgment, the bankruptcy court made no specific findings with regard to the fifth, sixth and seventh issues presented on appeal by the

**16.** This decision of the Fifth Circuit is binding as precedent on all federal courts within the

Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981).

appellants. This Court cannot effectively review the grant of summary judgment on appeal without such findings. Accordingly,

**IT IS HEREBY ORDERED** that the February 4, 1991, decision of the bankruptcy court holding that valid maritime liens are superior to perfected UCC security interests be and is affirmed.

**IT IS FURTHER ORDERED** that the February 5, 1992, decision of the bankruptcy court be and is affirmed.

**IT IS FURTHER ORDERED** that the fifth, sixth, and seventh issues on appeal be and are remanded for specific findings by the bankruptcy court.